𝕴𝖓 𝖙𝖍𝖊
# 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕿𝖍𝖎𝖗𝖉 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

◆

GABRIEL GRAY, et al.,

*Appellants in No. 23-1633,*

v.

ATTORNEY GENERAL DELAWARE,

*D. Del. No. 1:22-cv-01500,*

◆

CHRISTOPHER GRAHAM, et al.,

*Appellants in No. 23-1634,*

v.

ATTORNEY GENERAL DELAWARE,

*D. Del. No. 1:23-cv-00033*

◆

On Appeal from the U.S Dist. Ct. for the Dist.
of Del. No. 1:22-cv-00951 & 1:23-cv-00033
The Honorable Richard G. Andrews

◆

**PLAINTIFFS-APPELLANTS' OPENING BRIEF**

◆

Bradley P. Lehman
GELLERT SCALI BUSENKELL
  & BROWN LLC
1201 N. Orange Street, Ste. 300
Wilmington, DE 19801
Tel: (302) 425-5800
Fax: (302) 425-5814
blehman@gsbblaw.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

# TABLES OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ............................................................................. 1

JURISDICTION ................................................................................ 2

ISSUES PRESENTED ...................................................................... 3

RELATED CASES AND PROCEEDINGS ....................................... 3

STATEMENT OF THE CASE ........................................................... 4

   I.   Delaware's ban on common semiautomatic firearms. ................... 4

   II.   Delaware's ban on common ammunition magazines. ................... 6

   III.   The bans' impacts on Plaintiffs-Appellants. ................................ 7

   IV.   The proceedings below. ................................................................ 8

SUMMARY OF THE ARGUMENT ................................................. 10

ARGUMENT ................................................................................... 12

   I.   Standard of Review ...................................................................... 12

   II.   The banned firearms and magazines are protected by the Second
       Amendment ................................................................................. 13

   III.   Defendants fail to justify their ban as consistent with the Nation's
       historical tradition of firearms regulation. ................................. 15

       A. The banned firearms and magazines are in common use for
          lawful purposes ...................................................................... 15

       B. Because the arms at issue are in common use, Delaware's bans are
          inconsistent with our Nation's history and tradition. ........... 30

   IV.   The remaining injunction factors favor granting preliminary relief. ............ 52

CONCLUSION ................................................................................................53

# TABLE OF AUTHORITIES

**Cases**                                                       **Page**

*Association of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ........................................14, 18, 19, 23

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ..................21, 22, 27, 30

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)............................53

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Downey v. Pa. Dep't of Corr.*, 968 F.3d 299 (3d Cir. 2020)............................14, 15

*Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019) ..................................23

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) ....................................18

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) ....................................18

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020)............................33

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ....................................27, 52

*Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447 (2015) ............................18

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)....................*passim*

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
710 F.3d 99 (3d Cir. 2013) ........................................52, 53

*Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971) ........................................52

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ........................................34, 35

*Malloy v. Hogan,* 378 U.S. 1 (1964)........................................34

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................................33

*Miller v. Bonta*, 542 F. Supp. 3d 1009 (S.D. Cal. 2021) ..................................40, 42

*Miller v. Bonta,* 2022 WL 3095986 (9th Cir. Aug. 1, 2022)..................................40

*Myers v. United States*, 272 U.S. 52 (1926) ........................................34

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)........................................*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) ........................................19

*Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180 (3d Cir. 2022) ...................12

*Nunn v. Georgia*, 1 Ga. 243 (1846) ........................................45

*People v. Webb*, 131 N.E. 3d 93 (Ill. 2019) .................................................22

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018) .......................22

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ...............12, 16

*Staples v. United States*, 511 U.S. 600 (1994) ...........................17, 28, 48

*Stenberg v. Carhart*, 530 U.S. 914 (2000) ..............................................17

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ............53

## Statues and Rules

28 U.S.C.

§ 1331 .................................................................................................2

§ 1343 .................................................................................................2

§ 1292(a)(1) .......................................................................................2

18 U.S.C.

§ 922(g)(1) .........................................................................................6

§ 922(o)(2)(b) ..................................................................................28

DEL. CODE ANN. tit. 11,

§ 1465 .................................................................................................4

§ 1465(2) ............................................................................................4

§ 1465(3) ............................................................................................4

§ 1465(4) ............................................................................................4

§ 1465(6)(a) ...............................................................................4, 5, 41

§ 1465(6)(c) ........................................................................................5

§ 1466 .................................................................................................4

§ 1466(a) ............................................................................................5

§ 1466(b) ............................................................................................5

§ 1466(c)(3) ........................................................................................6

§ 1466(d) ............................................................................................6

§ 1468(2) ............................................................................................6

§ 1469(a) ............................................................................................6

§ 1469(b) .........................................................................................6, 7

iv

§ 1469(c) ............................................................6

§ 1469(c)(7) ........................................................6

§ 1469(d) ...........................................................6

§ 4205(b)(4) ........................................................6

§ 4205(b)(5) ......................................................6, 7

1852 Haw. Sess. Laws 19 ......................................44

1763–1775 N.J. Laws 346 (1771) ..........................33

1859 Ind. Acts. 129 ..............................................43

1870 La. Acts 159-60 ............................................43

1872 Md. Laws 57 ................................................45

1873 Ala. Offenses Against Public Justice § 4110 ....45

1883 Kan. Sess. Laws 159, §§ 1–2 ........................46

1889 Ariz. Sess. Laws 16 ......................................44

1890 Okla. Laws 495 ............................................44

1913 Haw. Rev. Laws ch. 209 ..............................44

1915 N.D. Laws 96, ch. 83, §§ 1–3, 5 ..................47

1917 Cal. Sess. Laws 221–225, § 5 ......................46

1917 N.C. Sess. Laws 390, ch. 209, § 1 ................49

1920 N.J. Laws 67, ch. 31, § 9 ............................49

1923 Cal. Stat. 695 ..............................................46

1923 Mo. Laws 24-42 ..........................................44

1923 S.C. Acts 221 ..............................................46

1927 Cal. Stat. 938 ..............................................48

1927 Ind. Acts 469 ..............................................32

1927 Mass. Acts 416 ............................................48

1927 Mich. Pub. Acts 888-89 ..........................32, 49

1927 R.I. Pub Laws 256 ........................................49

1929 Mo. Laws 170 ..............................................48

1931 N.Y. Laws 1033, ch. 435, § 1 ......................47

1932, Public-No. 275-72D (District of Columbia) .................................................49

1933 Cal. Stat. 1169 ....................................................................................48, 49

1933 Haw. Sess. Laws 117 ................................................................................48

1933 Minn. Laws ch. 190 .................................................................................49

1933 Ohio Laws 189-90 ....................................................................................48

1933 S.D. Sess. Laws 245-47 ............................................................................48

1933 Wash. Sess. Laws 335 ..............................................................................48

1934 Va. Acts 137-39 .......................................................................................48

1959 Mich. Pub. Acts 249, 250 .........................................................................49

1959 R.I. Acts & Resolves 260, 263 ..................................................................49

2 COLO. CODE REGS. § 406-2:203(a)(1) ...........................................................40

Charter and Revised Ordinances of Boise City, Idaho 119-20 (1894) ...................44

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which
     are Prefixed the State Laws Incorporating, and Relating to, the City,
     364-65 (1893) ...........................................................................................44

Colo. Rev. Stat. 1774, § 248 (1881) ...................................................................43

Geoffrey Andrew Holmes, Compiled Ords. of the City of Council Bluffs, and
     Containing the Statutes Applicable to Cities of the First-Class, Organized
     Under the Laws of Iowa 206–07 (1887) .......................................................47

George R. Donnan, Ann. Code of Crim. P. & Penal Code of the State of N.Y. as
     Amended 1882-5, § 410 (1885) ..............................................................43, 46

Gilbert B. Colfield, Laws, Ordinances, and Rules of Nebraska City,
     Otoe County (1872) ...................................................................................44

Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann.,
     Crim. Code, chap. 38 (1885) .......................................................................46

James H. Shankland Public Statues of the State of Tennessee, since the Year 1858.
     Being in the Nature of a Supplement to the Code, at 108 (1869) ..................43

Joplin Code of 1917, art. 67, § 1201 ..................................................................43

Revised Ordinances of Provo City, Containing All The Ordinances In Force 105,
     106-107 (1877) ..........................................................................................44

W. VA. CODE R.  58-50-3.2 ..............................................................................40

Wash. 1933 Sess. Laws 335 ..............................................................................48

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix (1881)......................................................................43, 44

## Other Authorities

*2021 Firearms Retailer Survey Report*, NSSF (2021), https://bit.ly/3gWhI8E19, 20, 21, 23, 24, 25

7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (1907)..........................39

*Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv ..............................................19

*Crime Data Explorer*, FBI, U.S. DEP'T OF JUST. (2020), https://bit.ly/3AA8Qwj ............................................................................25, 26

David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994)..........................................................17, 18, 41

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849 (2015)........................................................................23

E. Gregory Wallace, *Assault Weapon Myths*, 43 S. ILL. U. L. J. 193 (2018).....41, 42

*Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (Jan. 10, 2023) https://bit.ly/3mR58uT ............................51, 52

*Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019, Crime in the United States*, FBI, U.S. DEP'T OF JUST. (2019) https://bit.ly/31WmQ1V ..............................................................................26

GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL (1997)..............25

GERALD PRENDERGHAST, REPEATING AND MULTI-FIRE WEAPONS (2018)..............39

Gilbert B. Colfield, Laws, Ordinances, and Rules of Nebraska City, Otoe County (1872) ..............................................................................44

GUN DIGEST 2023 (Philip Massaro ed., 76th ed. 2022)..........................................23

Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018), https://bit.ly/41mELfr......40

John Adams, Letter To the Inhabitants of the Colony of Massachusetts-Bay, FOUNDERS ONLINE (Feb. 6, 1775), https://bit.ly/2SwaXi4............................38

Joseph Belton, *Letter to the Continental Congress*, Apr. 11, 1777, *in* PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, vol. 1 A-B................39

Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. (Jan. 2019), https://bit.ly/31VjRa9........................26

Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), https://bit.ly/3CMSKjw ................................................................................................33

Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *In Arms-ban Cases—Again* (June 18, 2023), https://bit.ly/3PTEiP1 .................................................................................32

Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue,* 60 HASTINGS L.J. 1285 (2009) .....................................................19

NSSF, MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT (2022), https://bit.ly/3GLmErS .........................................................................23, 25

NSSF, *NSSF Releases Most Recent Firearm Production Figures* (Nov. 16, 2020), http://bit.ly/405lKN9 ..................................................................................24

NSSF, SPORT SHOOTING PARTICIPATION IN THE U.S. IN 2020, (2021), https://bit.ly/3sPuEQl .................................................................................25

*Poll of current gun owners*, WASH. POST-IPSOS (Mar. 27, 2023), https://bit.ly/42jBqOn .................................................................................25

RANDOLPH ROTH, AMERICAN HOMICIDE (2009).........................................37

Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02 .......................................................................18

STEPHEN P. HALBROOK, AMERICA'S RIFLE (2022) ...........................................39, 42

STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS (2021) .............................37, 38

Tr. of Oral Arg., *Heller*, No. 07-290 (U.S. Mar. 18, 2008), https://bit.ly/3pwNbD9 ................................................................................38

Violence Policy Center and the Police Chiefs of Los Angeles, Minneapolis, and Seattle as *Amici Curiae* in Support of Pet'rs, 2008 WL 136348, *District of Columbia v. Heller*, No. 07-290 (Jan. 11, 2008) ......................................50, 51

William English, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use* (May 4, 2023), https://bit.ly/3r42Ydc...........................24

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw ...................................................................................19

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix (1881)........................................................................................43, 44

**INTRODUCTION**

Under the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), Plaintiffs must prevail in their challenge to Delaware's bans on commonly owned semiautomatic firearms and magazines. *Bruen* unequivocally reaffirms what *District of Columbia v. Heller*, 554 U.S. 570 (2008) teaches: that arms that are in common use for lawful purposes are protected and their possession and use cannot be banned—full stop.

The district court correctly found that the plain text of the Second Amendment—the first point of analysis under *Bruen*—presumptively covers the ownership of the semiautomatic firearms and magazines that Delaware bans. But the district court erred in its analysis of history. The district court wrongly held that Delaware's bans, which affect some of the most popular firearms and magazines in the country, could be justified by reference to a pattern of historical regulation targeting a variety of arms, from "slung shots" to machine guns. But the State has not put forward, and the district court did not cite, a single law that banned possession or carriage of an arm that was in common use at the time like the Delaware bans do. That alone is fatal to Delaware's historical argument, but it fails in other ways too: the district court largely accepted the state's expert's reading of history, which was riddled with errors as an examination of the supporting laws will

show, and the district court conducted its analogical reasoning at such a high level of generality that its analysis would, if followed, entail the reversal of *Heller* itself.

Properly analyzed, the historical record confirms that *Heller* and *Bruen* were right. Arms in common use cannot be banned, and Plaintiffs are likely to succeed on their Second Amendment claims. And because they are likely to succeed in showing their rights are currently being violated, the other preliminary injunction factors all favor them as well.

## JURISDICTION

Appellants allege that provisions of Delaware law violate the United States Constitution. App.625–27, App.654–56. The district court had subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this case involves a constitutional challenge to state law. The district court entered an order on March 27, 2023, denying Appellants' motions for a preliminary injunction. App.38. Appellants timely noticed their appeal on April 5, 2023. App.1, App.3. This Court has jurisdiction over the district court's interlocutory order refusing a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

(1)  Whether Delaware's ban on commonly possessed firearms that the State mischaracterizes as "assault weapons" violates the Second Amendment, as

incorporated by the Fourteenth Amendment. Issue raised: App.625–27. Issue ruled upon: App.34.

(2)     Whether Delaware's ban on commonly possessed ammunition magazines that the State mischaracterizes as "large capacity" violates the Second Amendment, as incorporated by the Fourteenth Amendment. Issue raised: App.654–56. Issue ruled upon: App.34.

(3)     Whether the district court erred in refusing to grant a preliminary injunction. Issue raised: App.627, App.657. Issue ruled upon: App.37.

## RELATED CASES AND PROCEEDINGS

This consolidated appeal arises out of three lawsuits challenging Delaware's bans on common firearms and ammunition magazines, which were also consolidated in the district court and addressed in a single opinion and order. The parties filing this brief are the Appellants in Nos. 23-1633 and 23-1634—the Plaintiffs in *Gray v. Jennings*, No. 22-cv-01500 (D. Del.), and *Graham v. Jennings*, No. 23-cv-33 (D. Del.), respectively. The Plaintiff-Appellants in *Gray* challenge Delaware's ban on certain semi-automatic firearms; the Plaintiff-Appellants in *Graham* challenge Delaware's ban on certain firearm magazines. Both appeals have also been consolidated with No. 23-1641. The Appellants in that case, who are separately represented and will be filing a separate brief, are the Plaintiffs in *Delaware State Sportsmen's Ass'n v. Delaware Department of Safety and Homeland Security*, No.

22-cv-951, and they challenge both Delaware's firearm and magazine bans. None of the consolidated cases have been before this Court previously, and the Gray and Graham Appellants are unaware of any other related cases.

## STATEMENT OF THE CASE

### I.  Delaware's ban on common semiautomatic firearms.

The State of Delaware deems scores of common semiautomatic firearms "assault weapons"—and bans them outright. DEL. CODE ANN. tit. 11, §§ 1465, 1466. "The list of prohibited firearms is long. It includes (1) forty-four enumerated semi-automatic 'assault long gun[s],' including the AR-15, AK-47, and Uzi, (2) nineteen specifically identified semi-automatic 'assault pistol[s],' and (3) 'copycat weapon[s].'" App.10 (citations omitted); *see* DEL. CODE ANN. tit. 11, §§ 1465(2), (3), & (4). "Copycat weapons" are defined to include any semiautomatic, centerfire rifle that has at least one of the following features:

1.    A folding or telescoping stock.

2.    Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.

3.    A forward pistol grip.

4.    A flash suppressor.

5.    A grenade launcher or flare launcher.

DEL. CODE ANN. tit. 11, § 1465(6)(a). "Copycat weapons" also include any semiautomatic pistol that "can accept a detachable magazine" and has at least one of the following features:

> 1.　　An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip.
>
> 2.　　A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer.
>
> 3.　　A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel.
>
> 4.　　A second hand grip.

*Id.* § 1465(6)(c).

Delaware bans any person from manufacturing, selling, purchasing, receiving, possessing, or transporting one of these firearms into the State, unless they belong to a narrow class of favored individuals such as U.S. Government personnel, members of the armed forces, and law enforcement officers. *Id.* § 1466(a), (b). Ordinary citizens may transport, possess, purchase, or receive the banned firearms only if they lawfully possessed or purchased them before June 30, 2022, and only if specified circumstances. *Id.* § 1466(c)(3).

Violation of Delaware's semiautomatic firearm ban is punishable by up to 8 years in prison, *see id.* §§ 1466(d), 4205(b)(4), and results in a lifetime disqualification from owning firearms and ammunition, *see* 18 U.S.C. § 922(g)(1).

## II.    Delaware's ban on common ammunition magazines.

Delaware also bans common, standard-sized firearm ammunition magazines. The state defines "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition" as a so-called "Large-capacity magazine." DEL. CODE ANN. tit. 11, § 1468(2). Again, it is unlawful for anyone who does not fit within a narrow category of favored, exempt individuals to "manufacture, sell, offer for sale, purchase, receive, transfer, or possess" one of the banned magazines. *Id.* §§ 1469(a), (c). Unlike with the banned semiautomatic firearms, even individuals who lawfully owned one of the banned magazines before the ban took effect must now dispose of them—by, for example, having the magazine "permanently modified to accept 17 rounds of ammunition or less," or by relinquishing the magazine to the Delaware Department of Safety and Homeland Security through a buyback program. *See id.* §§ 1469(c)(7), (d).

Violation of Delaware's ban on common ammunition magazines is punishable by a fine of $100 for the first violation, forfeiture of the magazine, and penalties ranging up to 5 years imprisonment for subsequent violations. *See id.* §§ 1469(b), 4205(b)(5).

## III.    The bans' impacts on Plaintiffs-Appellants.

Plaintiffs Gray, Taylor, Graham, and Stevens are law-abiding United States citizens and residents of Delaware. App.621–22, App.636–37. Plaintiffs Gray and

Taylor wish to acquire, possess, and use for lawful purposes the common semiautomatic firearms Delaware bans, and they would do so were it not for the State's ban on that conduct. App.621–22. Plaintiffs Graham and Stevens both own firearms capable of being equipped with greater-than-seventeen-round magazines, as well as several magazines capable of holding more than seventeen rounds, and they wish to purchase more of those magazines, yet they are forced to refrain from doing so solely because of the State's ban on that conduct.

Plaintiff DJJAMS LLC is a federally licensed firearm dealer operating in Delaware. App.622. Many current and prospective customers wish to purchase the firearms Delaware bans as "assault weapons" from DJJAMS, and DJJAMS wishes to sell those common semiautomatic firearms to them. *Id*. It refrains from doing so only because it reasonably fears enforcement of Delaware's ban on that conduct. App.622–23. As a result of the ban, it has been forced to turn away prospective customers wishing to purchase the banned firearms, and it has experienced a notable decline in revenue. App.623.

The plaintiffs in both the *Gray* and *Graham* appeals are also joined by two associational plaintiffs, the Firearms Policy Coalition ("FPC") and Second Amendment Foundation ("SAF"). App.623–25, App.637. Both associational plaintiffs have members in Delaware who wish to purchase and possess the banned

semiautomatic firearms and ammunition magazines and would do so but for the challenged provisions. App.622–23, App.637.

## IV.    The proceedings below.

Plaintiffs Gray, Taylor, DJJAMS, FPC, and SAF filed suit challenging Delaware's ban on certain semiautomatic firearms on November 16, 2022. App.600. They promptly moved for a preliminary injunction against the ban. App.629. On December 20, the district court consolidated the *Gray* suit with *Delaware State Sportsmen's Ass'n v. Delaware Department of Safety and Homeland Security*, No. 22-cv-951 (D. Del.), another pending suit that challenged both the firearm and magazine bans and likewise sought a preliminary injunction.

On January 12, 2023, Plaintiffs Graham, Stevens, FPC, and SAF filed suit challenging Delaware's magazine ban. App.633. The district court consolidated the *Graham* suit with the *Gray* and *Delaware State Sportsmen's Ass'n* cases on March 6, 2023. On March 15, the *Graham* Plaintiffs joined in the pending preliminary injunction motion. App.596.

On March 27, 2023, the district court entered an opinion and order refusing to preliminarily enjoin the challenged bans. The court correctly concluded that both the banned semiautomatic firearms and ammunition magazines are protected by the Second Amendment, since both the firearms and magazines are " 'arms' within the meaning of the Second Amendment." App.12, App.15, App.16–17. The court also

properly concluded both the banned firearms and magazines are " 'in common use' for lawful purposes that include self-defense," and it accordingly rejected Delaware's argument that the banned firearms and magazines are unprotected because they are "dangerous an unusual," explaining that although the prohibited arms "are 'dangerous,' " Defendants "cannot show that [they] are unusual," given that they are in common use for lawful purposes. App.21, App. 23.

Despite concluding that the arms banned by Delaware are in common use for lawful purposes, which under *Heller* and *Bruen* should have mandated a judgment for Plaintiffs, the district court nonetheless went on to ask whether Delaware could "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." App.24 (quoting *Bruen*, 142 S. Ct. at 2129–30). It answered that question yes, concluding that the banned firearms and magazines "implicate dramatic technological change and unprecedented societal concerns," due to the purported "rise in the yearly rate of public mass shootings over the past four decades" and the features that supposedly render the banned arms "exceptionally dangerous." App.21, App.23. It further reasoned that Delaware's ban was "relevantly similar" to a cobbled-together collection of historical laws— including mid-nineteenth-century laws that restricted the *carry* (but not the *possession*) of "Bowie knives," and mid–*twentieth*-century restrictions on "[f]ully automatic" machine guns, App.29–30, App.32. These purported historical

analogues, the court concluded, sufficed to place the challenged bans within "the Nation's historical tradition of firearm regulation." App.34. Therefore, according to the district court, Plaintiffs were unlikely to succeed on the merits of their Second Amendment challenges.

Finally, the court concluded that Plaintiffs had also failed to show irreparable harm, rejecting their argument that the deprivation of Second Amendment rights constitutes *per se* irreparable harm. App.34–35.

## SUMMARY OF THE ARGUMENT

As a matter of plain text, the Second Amendment extends to "all instruments that constitute bearable arms," *Bruen*, 142 S. Ct. at 2132; *i.e.*, "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581. As a matter of history, *Heller* and *Bruen* establish that the only exception to this broadly protective amendment, is that arms that are "dangerous and unusual" are not protected. However, if an arm is "in common use" then it is, by definition, not dangerous and *unusual*. In this case, that is dispositive and the State and the district court's arguments to the contrary, including the argument that these arms, which are chosen by millions of Americans for the purpose of self-defense, are by their nature ill-suited to that purpose, are irrelevant and should be disregarded.

That is all this Court needs to analyze to find Plaintiffs are likely to succeed on the merits—there is no need to do a new analysis of historical limitations on the scope of the right because *Bruen* and *Heller* have already done the historical work here. Even if this Court does address the historical arguments put forward by the State (as the district court erroneously did), it should reverse on the grounds that the district court's conclusion that the proffered historical analogues are relevantly similar to the Delaware bans was wrong. In addition to wrongly emphasizing history that long postdated the Founding (the critical period for determining the Second Amendment's meaning), the district court was misled by the State's historical expert into finding that laws existed stringently regulating all manner of arms when in fact the cited laws say nothing like what the State or the district court claim. In examining the historical record, all this Court will find is confirmation that the Supreme Court was correct to conclude that, historically speaking, only dangerous and unusual weapons could be banned consistent with the Second Amendment. The firearms and magazines at issue here are neither of those things, and so the Delaware bans are unconstitutional, and Plaintiffs are likely to succeed on the merits. And because they are likely to succeed in showing a violation of a fundamental constitutional right, the other injunction factors all favor Plaintiffs as well.

**ARGUMENT**

## I.     Standard of Review.

When reviewing a district court's refusal to grant a preliminary injunction, the Court inquires whether the movant has shown "(1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). In addition, the Court, "in considering whether to grant a[n] . . . injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id*. The movant need only meet the first two factors, after which a court balances all the factors, and the first factor is met where the prospect of success on the merits is "significantly better than negligible." *Id.* at 179 & n.3.

In an appeal from the denial of a preliminary injunction, this Court "review[s] the District Court's factual findings for clear error, the legal conclusions de novo, and the decision whether to grant an injunction for abuse of discretion." *Nichino Am., Inc. v. Valent U.S.A. LLC*, 44 F.4th 180, 184 & n.7 (3d Cir. 2022). All the issues here are legal, so review is de novo.

## II. The banned firearms and magazines are protected by the Second Amendment.

Delaware's bans on common firearms and magazines are unconstitutional, and the district court erred in concluding that Plaintiffs are unlikely to prevail. *Bruen* leaves no room for doubt about the standard that applies:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct . . . . The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2129–30.

The initial question, then, is whether the "plain text" of the Second Amendment protects the right to acquire, possess, and use for lawful purposes the firearms and magazines banned by Delaware. *Id.* at 2129; *see id.* at 2129–31. Here, too, Supreme Court precedent gives clear direction on how to answer that question: "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. As the district court correctly concluded, both the semiautomatic firearms and the ammunition magazines that Delaware has banned fall within the Second Amendment's protective scope under that standard.

A. Determining whether the Second Amendment extends, prima facie, to the common semiautomatic firearms that Delaware bans requires no analysis at all.

Because each of the firearms at issue plainly qualifies as a "thing that a man . . . takes into his hands, or useth in wrath to cast at or strike another," the semiautomatic firearms banned by Delaware comfortably fit within the Founding-Era definition of "arms." *Id.* at 581. Indeed, as the district court noted, Defendants "do not dispute" that the banned firearms "belong to the broad category of weapons constituting 'bearable arms.' " App.17.

B.     Ammunition magazines capable of holding more than seventeen rounds also easily qualify as "arms" and thus fall, prima facie, within the Second Amendment's "plain text." As this Court explained in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey* ("*ANJRPC*"), "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." 910 F.3d 106, 116 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *accord Bruen*, 142 S. Ct. at 2132 ("[E]ven though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."). After all, "[r]egulations that eliminate a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *ANJRPC*, 910 F.3d at 116 (cleaned up). The Court's holding in *ANJRPC* that "magazines are 'arms' within the meaning of the Second

Amendment," *id.*, is plainly correct, and it is binding here. *See Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 308 n.8 (3d Cir. 2020).

"The Second Amendment's plain text thus presumptively guarantees" Plaintiffs the right to keep and bear the firearms and magazines at issue, and under *Bruen*, that means that the inquiry shifts from text to history, and the burden is placed on Delaware to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130, 2135.

## III. Defendants fail to justify their ban as consistent with the Nation's historical tradition of firearms regulation.

As with the inquiry into the Second Amendment's text, the district court's job in analyzing its history should have been an easy one, because binding Supreme Court precedent once again provides dispositive directions. The district court concluded that Defendants were likely to bear their historical burden only by ignoring them.

### A. The banned firearms and magazines are in common use for lawful purposes.

*Heller* and *Bruen* precisely determine the limits of the Government's authority, "consistent with the Nation's historical tradition of firearm regulation," to enact "a 'complete prohibition' " on a type of firearm. *Bruen*, 142 S. Ct. at 2128, 2130. It can enact and enforce such a ban, those decisions hold, *only* if the banned arms are not "the sorts of weapons . . . in common use at the time," so that its

regulation falls within "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627 (cleaned up). And both the semi-automatic firearms and ammunition magazines banned by Delaware *are* "in common use . . . for lawful purposes." *Id.* at 624 (cleaned up).

1.     Because *Bruen* squarely places the burden on *the Government* to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—including "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—it *falls to Delaware* to show that the arms it has banned are "unusual," and thus *not* "in common use at the time." To be sure, preliminary injunction movants "normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits," *Reilly*, 858 F.3d at 180; *see* App.17. But as this Court has explained, in "cases where the government bears the burden of proof on the ultimate question of a statute's constitutionality, plaintiffs must be deemed likely to prevail for the purpose of considering a preliminary injunction unless the [g]overnment has shown" that it can carry its burden on the underlying claim. 858 F.3d at 180 (cleaned up). "That is because the burdens at the preliminary injunction stage track the burdens at trial." *Id.* (cleaned up). Defendants submitted no information whatsoever to establish that the banned firearms and magazines *are not* in common use, and that should be the end of the matter.

In any event, though the burden at this stage of the *Bruen* analysis does not rest on Plaintiffs, they submitted substantial uncontradicted evidence establishing that the banned semiautomatic firearms are in common use. While Delaware calls the firearms it bans "assault weapons," that is a pejorative term that does not refer to any identifiable class of firearms. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted). But while "assault weapons" are not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic firearms that Delaware labels as "assault weapons" and that Plaintiffs wish to acquire.

The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic firearm, a semiautomatic firearm will not fire continuously on one pull of its trigger; rather, a semiautomatic firearm requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). In contrast to fully automatic firearms, semiautomatic firearms have "traditionally have been widely accepted as lawful possessions." *Id*. Indeed, semiautomatic firearms have been commercially available for over a century. *See Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1287 (D.C.

Cir. 2011) (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). Yet apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of States do not ban semiautomatic "assault weapons." (In addition to Delaware, the only states that have enacted bans on "assault weapons" (with varying definitions of that term) are California, Connecticut, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, and Washington.) *See* Shawna Chen, *10 states with laws restricting assault weapons*, AXIOS (Apr. 28, 2023), https://bit.ly/3pukU02.

Even accepting Delaware's framing, if the banned firearms *are* considered as a separate category of arms rather than simply examples of semiautomatic firearms, they still easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in that category. Commonality in this case "is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *rev'd sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc), *granted, vacated, and remanded in light of Bruen*, 142 S. Ct. 2895 (2022); *see also Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari) (reasoning that "citizens . . . have a right under the Second Amendment to keep" "AR-style semiautomatic rifles" because "roughly five million Americans own" them and "the

overwhelming majority . . . do so for lawful purposes"); *ANJRPC*, 910 F.3d at 116 (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated by Bruen* ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that the State bans.

The AR-15 is America's "most popular semi-automatic rifle," *id.* at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Today, the number of AR-rifles and other similar "modern sporting rifles" in circulation in the United States exceeds *twenty-four million. Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv; *see also* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1–2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6 million American gun owners have owned AR-15s or similar rifles). In recent years they have been the second-

most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See 2021 Firearms Retailer Survey Report* at 9, NSSF (2021), https://bit.ly/3gWhI8E. Considering figures such as these, the district court properly concluded that "the prohibited assault long guns are in common use for self-defense." App.23.

The district court held that "Plaintiffs have failed to satisfy their burden" of showing that the "copycat weapons" that Delaware bans based on their possession of certain features are in common use. But the burden under *Bruen* falls *to the Government* to show that each of the banned weapons is "unusual" rather than "in common use," and its failure to do so means that Plaintiffs *are* likely to prevail on the merits of their Second Amendment challenge as to the "copycat weapons." In any event, the district court's holding is also wrong in substance. All the copycat weapons are semiautomatic. And Professor English's survey, for example, is not limited to the semiautomatic firearms that Delaware enumerates by name, but rather extends to the "AR-15 *or similarly styled rifle[s]*,"—"similar[ ]" rifles are precisely what Delaware has deemed to be "assault weapons." *National Firearms Survey*, *supra*, at 33.

While these statistics concern semiautomatic rifles, there is no basis for reaching a different conclusion with respect to the banned semiautomatic handguns. Again, just like the rifles, they are semiautomatic and semiautomatic firearms are

20

indisputably common. *See, e.g., id.* at 9 (showing semi-automatic pistols and rifles accounted for 64.5% of firearm sales in 2020). And again, it is *Delaware's burden*, under *Bruen*, to show that its bans fall within the historical tradition allowing regulation of arms that are "dangerous and unusual" rather than "in common use." Accordingly, the district court's conclusion that Plaintiffs had not borne their burden of showing that so-called "assault pistols are 'in common use,' " App.17, gets the matter precisely backwards. And because Delaware has not come forward with any evidence showing that so-called "assault pistols" are unusual rather than common, it is unlikely to justify its ban in this way, and Plaintiffs are perforce likely to succeed.

The Supreme Court's decision in *Caetano v. Massachusetts* further confirms that the arms banned by Delaware are in common use for lawful purposes. That case concerned Massachusetts' ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. 577 U.S. 411 (2016). With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J.,

concurring) (cleaned up). Of course, that is far fewer than the millions of semiautomatic firearms sold to private citizens nationwide that the State bans.

The Massachusetts Supreme Judicial Court got the message. In a subsequent case, that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E. 3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the *prima facie* presumption of [S]econd [A]mendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019) (citation omitted). This reasoning is sound, and necessarily entails the invalidity of Delaware's ban, which restricts arms that are much more common than stun guns.

2.     There also can be no question that firearm magazines capable of holding more than 17 rounds are in common use. That is evident, first, by the overwhelming popularity of the firearms that come standard with them. As explained above, the AR-15, for example, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and over 24 million AR-15s

and similar AR-style rifles are currently in circulation. And these rifles come standard with 20- or 30-round ammunition magazines, *see Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019); David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. REV. 849, 859 (2015); GUN DIGEST 2023 399, 401, 402, 404, 405, 406, 407 (Philip Massaro ed., 76th ed. 2022). Indeed, evidence indicates that 52% of recently acquired AR-style and other modern sporting rifles came equipped with 30-round magazines. NSSF, MODERN SPORTING RIFLE: COMPREHENSIVE CONSUMER REPORT 31 (2022), https://bit.ly/3GLmErS.

The ubiquity of 18-plus-round magazines is further confirmed by this Court's decision in *ANJRPC*. There, the Court held that the magazines banned by New Jersey in that case—those capable of holding more than ten rounds—were owned by the "millions, . . . often come factory standard with semi-automatic weapons, [and] are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense." *ANJRPC*, 910 F.3d at 116. Professor English's comprehensive survey provides more recent evidence supporting this conclusion: according to that study, Americans have owned as many as 542 million rifle and handgun magazines capable of holding more than 10 rounds—and approximately 382 million magazines that hold more than 15 rounds. *See National Firearms*

*Survey*, *supra*, at 23–25.[1] And NSSF estimates that there are 79.2 million rifle magazines capable of holding 30 or more rounds in circulation today. *See* NSSF, *NSSF Releases Most Recent Firearm Production Figures* (Nov. 16, 2020), http://bit.ly/405lKN9. While Delaware's ban reaches the somewhat smaller class of more-than-17-round magazines, it hardly requires an inferential leap to conclude from this evidence alone that these arms, too, are in common use by the hundreds of millions. *See* William English, *2021 National Firearms Survey: Analysis of Magazine Ownership and Use* at 19–20 (May 4, 2023), https://bit.ly/3r42Ydc (finding that Americans have owned 170 million handgun magazines holding more than 15 rounds and 214 million rifle magazines holding more than 15 rounds). Again, the district court agreed, concluding that the banned magazines "are in common use for self-defense." App.23.

3. These ubiquitous firearms and magazines are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In Professor English's 2021 survey, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). *National Firearms*

---

[1] Professor English estimates that approximately 39 million Americans have owned at least one magazine capable of owning more than 10 rounds; these owners further report that they have owned, on average, 4.4 handgun magazines and 5.4 rifle magazines with a capacity of more than 15 rounds.

*Survey*, *supra*, at 33–34. The survey made similar findings for magazines capable of holding more than 10 rounds. *Id.* at 23. This is consistent with the findings of another recent survey of over 2,000 owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning firearms of the kind banned by Delaware. *See* MODERN SPORTING RIFLE, *supra*, at 5. And very recently the Washington Post separately reached essentially identical results, finding that 20% of current firearm owners own an AR-15 or similar style rifle, with 60% of AR owners reporting target shooting was a "major reason" for their owning the firearm and 30% citing it as a "minor reason." *Poll of current gun owners* at 1, WASH. POST-IPSOS (Mar. 27, 2023), https://bit.ly/42jBqOn. Protection of self, family, and property was even *more* important in this survey, with 65% of owners citing it as a major reason and 26% noting it as a minor reason. *Id.* Yet another survey found that more than 20 million adults participated in target or sport shooting with firearms like those Delaware has banned. NSSF, SPORT SHOOTING PARTICIPATION IN THE U.S. IN 2020 at *iii*, (2021), https://bit.ly/3sPuEQl.

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other banned rifles are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.' " GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). From 2015 through 2020, only 2.4% of murders were committed with

*any* type of rifle. *See Crime Data Explorer*, FBI, U.S. DEP'T OF JUST. (2020), https://bit.ly/3AA8Qwj; *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. DEP'T OF JUST. (2019), https://bit.ly/31WmQ1V (72,781 total murders; 1,573 with rifles). Murder by "hands, fists, feet, etc." was more than twice as common, at 3,346, over the same time period—and murder by handgun, at over 30,000, was approximately *20 times* as common. *Id.* Even if a different modern semiautomatic rifle had been used in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million of them in circulation in the United States during that time period—around .01 percent—would have been used for that unlawful purpose. More broadly, as of 2016, only 0.8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016 at 5 tbl. 3, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. (Jan. 2019), https://bit.ly/31VjRa9.

The People's overwhelming use of the banned firearms and magazines for lawful purposes suffices to establish that they are protected by the Second Amendment. The State contended below that Plaintiffs must *also* show that the banned arms are commonly used *specifically for self-defense*, but that is flatly contrary to *Heller* and *Bruen*. Even accepting the State's erroneous claim that only

self-defense matters when assessing whether a firearm is "in common use," that does not mean a firearm must be commonly *fired*. A firearm that is *kept* for self-defense, but fortunately not required to be actively *fired* in self-defense, is still being possessed for that purpose. Requiring firearms to be commonly fired (a rare event for any type of firearm, thankfully) would mean that *Heller* was wrong to find handguns are in common use. And of course, we should not accept the State's attempt to limit "common use" to self-defense. Yes, *Heller* establishes that armed self-defense is "the *central component*" of the Second Amendment, but it also repeatedly recognizes that the right to keep and bear arms extends to other lawful purposes—including "hunting" and "practis[ing] in safe places the use of them." 554 U.S. at 599, 619; *see also Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011). And the Supreme Court has repeatedly described Second Amendment as protecting arms that are generally "in common use at the time," *Heller*, 554 U.S. at 624; *see also id.* at 627; *Caetano*, 577 U.S. at 411, 412; *Bruen*, 152 S. Ct. at 2128, 2143—in common use "for lawful purposes *like* self–defense," yes, but plainly not *limited* to that purpose, *Heller*, 554 U.S. at 624.

Indeed, Defendants' argument would mean that a firearm that was commonly owned by ordinary, law-abiding citizens at the Founding but was most commonly used not for self-defense but for militia service—the very "purpose for which the

right was codified," *id.* at 599—would be *unprotected by the Second Amendment*. That cannot be right.

The district court responded that protecting firearms "simply because they are common" would purportedly "upend settled law" by implying that "machine gun restrictions [are] constitutionally suspect," since the "176,000 legal civilian-owned machine guns in the United States" "comes close to" the number of stun guns (200,000) that Justice Alito's *Caetano* concurrence identified as sufficient to show common use. App.14–16. But even going just by the numbers, it is far from clear that an arm that is over 10 percent less common than the 200,000 stun guns in circulation—which may well represent the lower bar of constitutional protection—qualifies as "in common use." Moreover, fully automatic machineguns are not "widely accepted as lawful possessions," *Staples*, 511 U.S. at 612, even if roughly 175,000 guns acquired before 1986 linger in civilian circulation, *see* 18 U.S.C. § 922(o)(2)(b). For in contrast to stun guns, handguns, and the firearms at issue in this case, machine guns have been tightly regulated since their creation, App.333–34, and have generally been unlawful to purchase or possess since 1986, 18 U.S.C. § 922(o)(2)(b). The constitutional status of the 176,000 machine guns grandfathered under the 1986 ban has little bearing on the protection of semi-automatic firearms that Americans own by the tens of millions.

In all events, as the district court correctly held, the firearms and magazines at issue here *are* commonly owned for the lawful purpose of self-defense. That is evident from the statistical evidence, cited above, showing that self-defense is a common reason cited by the owners of these arms for acquiring them, and it remains true even if they are rarely fired in self-defense in (vanishingly rare) " 'active shooter' incidents," and even if most Americans will fortunately *never have to fire* the arms they acquired to defend themselves. *See* App.19–20, App.23.

Delaware's related argument that the banned firearms and magazines are outside the Second Amendment's scope because they are "not well-suited" for self-defense, App.19, fails for similar reasons. As the district court explained, the Second Amendment protects those arms that are "chosen by Americans for self-defense" "*[w]hatever the reason*" for the choice. *Heller*, 554 U.S. at 629 (emphasis added). After all, it is the "balance . . . struck by the traditions of the American people . . . that demands our unqualified deference" under the Second Amendment. *Bruen*, 142 S. Ct. at 2131. And the Second Amendment *does not* contemplate "defer[ence] to the determinations of legislatures," *id.*, concerning which types of firearms are deemed "suitable" for use by ordinary citizens.

4.     Because the firearms and magazines banned by Delaware are "in common use at the time for lawful purposes," they cannot be "dangerous and unusual." *Heller*, 554 U.S. at 624, 626, 627 (cleaned up). *Heller* leaves no doubt

whatsoever that these two categories of arms are the opposite sides of the same coin: for the "historical tradition of prohibiting the carrying of dangerous and unusual weapons," was the Court's *whole justification in the first place* for interpreting the Second Amendment as protecting arms "in common use." *Id.* at 627. And the Court cannot have been clearer that these two categories of arms are mutually exclusive. After all, since "[a] weapon may not be banned unless it is *both* dangerous *and* unusual," *Caetano*, 577 U.S. at 417 (Alito, J., concurring), a firearm that is "in common use"—and hence not "unusual"—is protected by the Second Amendment and "may not be banned." *Id.* Delaware's argument that the arms at issue here are unprotected *even if they are commonly owned by law-abiding citizens* because they are "unusually dangerous," App.20, thus never gets off the ground.

> **B. Because the arms at issue are in common use, Delaware's bans are inconsistent with our Nation's history and tradition.**

1.      For the reasons explained above, the semiautomatic firearms and ammunition magazines banned by Delaware are in common use for lawful purposes, and the State cannot show that they fall within "the historical tradition" of restricting "dangerous and unusual weapons." *Heller*, 554 U.S. at 627. The district court correctly reached the same conclusion with respect to long guns banned by name (and should have reached the same conclusion with respect to banned handguns and copycat firearms). App.23. Its analysis should have ended there. For *Heller* and *Bruen* speak with one voice, and they speak clearly: where the government enacts a

prohibition on arms, the *only* way it can "justify its regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the banned arms are "dangerous and unusual" and thus fall outside the Second Amendment's protection of "the possession and use of weapons that are in common use at the time," *Bruen*, 142 S. Ct. at 2126, 2128 (cleaned up). If the government cannot make that showing because the firearms at issue are in common use, while historical tradition may justify other types of restrictions on the who, how, when, and where of using the firearms, it *does not justify a flat ban*, as a matter of binding Supreme Court precedent.

This conclusion does not, as the district court supposed, render the second step of *Bruen's* text-and-history standard irrelevant. Rather, it merely recognizes that in some contexts—including an absolute ban on certain firearms—the application of that standard has already been decided by the Supreme Court. Any further examination of history and tradition is not necessary or appropriate, because the Supreme Court has already done the historical analysis, and its conclusions are binding. Nor was the district court correct that "[i]f the standard were as Plaintiffs propose, then *Bruen* need not have proceeded beyond the first step of the analysis." App.24. For *Bruen* did not concern a flat ban on possessing firearms; it dealt with restrictions on carrying firearms outside the home—a different type of regulation

31

that required the Court to assess the government's proffered historical evidence afresh.

In short, the Supreme Court has conclusively determined that with respect to "a flat ban" on weapons, "this Nation's historical tradition of firearm regulation" *just is* that such a ban may be justified *only* if it is limited to weapons not in common use. *Bruen*, 142 S. Ct. at 2126, 2131. Because Delaware cannot justify the bans challenged here in that way, those bans are unconstitutional, and the district court erred in proceeding any further. *See* Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *In Arms-ban Cases—Again* (June 18, 2023), https://bit.ly/3PTEiP1.

2. Even if this threshold argument were set aside, the State still falls far short of providing an alternative historical justification for its bans. Delaware tacitly conceded that at the time of the Founding and for decades thereafter, *no* State or jurisdiction enacted any general ban on any arm in common use. Indeed, the first general arms bans of *any* kind that the State identified were the bans on the sale or possession of machine guns that several of States began to enact in 1927.[2] And much

---

[2] *See* App.333, App.406–07, App.416–451; *see also, e.g.*, 1927 Mich. Pub. Acts 888–89; 1927 Ind. Acts 469. Delaware's expert also points to what he calls "anti-trap gun laws," dating as early as 1776. App.317, App.547–55. These do not even arguably support Delaware's bans, since the devices known as "trap guns" were not "bearable arms," *Heller*, 554 U.S. at 582—which is likely why the district court did not rely on them. Rather, as the State's expert describes them, these devices were

of the rest of the State's purported historical evidence—most of which concerns the carrying of certain arms in public—comes from the late 1830s through the turn of the century. But the key period for understanding the Second Amendment is the time of its ratification—1791—so all of this later evidence comes far too late in the Nation's history to be relevant. *See* Mark W. Smith, *"Not all History is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues is when the Second Amendment was Ratified in 1791, and not 1868* (Oct. 1, 2022), https://bit.ly/3CMSKjw. Delaware's inability to identify *any general ban* on arms in common use until *over a century after the Second Amendment was ratified* is dispositive. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258–59 (2020).

Two principles—both established by binding and unequivocal Supreme Court precedent—necessitate the conclusion that 1791 is the critical year, not 1868—and *certainly* not the late 1920s. First, incorporated Bill of Rights provisions have the same meaning applied to the States as to the federal government. *See McDonald v.*

---

"contraptions rigged in such a way as to fire when the owner need not be present," through some string, wire, or spring mechanism. App.316–317. To the extent any of these laws also applied to bearable arms, they were more akin to gun storage rules— they merely restricted *using* an arm in the particular way of "set[ting] [it] in such Manner as [the arm] shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance." 1763-1775 N.J. Laws 346 (1771). The Supreme Court has squarely held that historical storage rules cannot justify firearm bans, since "they do not remotely burden the right of self-defense as much as an absolute ban." *Heller*, 554 U.S. at 632.

*City of Chicago*, 561 U.S. 742, 765 (2010). It has been a bedrock principle of Bill of Rights jurisprudence *for over five decades* that while it is the Fourteenth Amendment that *incorporates* the Bill of Rights' guarantees against the States, once incorporated, those rights have *exactly the same meaning against the States* as they do against the federal government. As the Court put the point in *Malloy v. Hogan* in 1964, the protections in the Bill of Rights are "to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment." 378 U.S. 1, 10–11 (1964). The Court has repeatedly reiterated that fundamental rule in the ensuing years, most recently *in Bruen itself*: "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." 142 S. Ct. at 2137.

Second, as *Bruen* also makes clear, the Supreme Court has always treated the ratification of the Bill of Rights as the key period for understanding the scope of the rights enumerated therein. *Id.* (collecting cases). Almost a century ago, the Court explained that the First Congress of 1789, is "a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instrument," *Myers v. United States*, 272 U.S. 52, 174–75 (1926), and this practice is no less true in the context of the Bill of Rights, *see, e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984) ("The interpretation

of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's [reasoning in *Myers*].").

To be sure, *Bruen* "acknowledge[d] that there is an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)," and it stated that it did not "need [to] address this issue." 142 S. Ct. at 2138. But the Court's decision not to wade into a "scholarly debate" cannot be read as changing or casting doubt on the longstanding precedent described above. And that precedent dictates that 1791 is the critical date.

Justice Barrett's concurring opinion in *Bruen* provides further confirmation of the point. Justice Barrett strongly suggested that "Reconstruction-era history" is "simply too late," and she cautioned that "today's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Id.* at 2163 (Barrett, J., concurring). It would be difficult to come up with a more apt description of Defendants' discussion of history in this case.

The *Bruen* majority opinion is fully consistent with Justice Barrett's analysis. For the majority, too, treated evidence surrounding 1791 as generally dispositive of the contours of the Second Amendment. "[W]hen it comes to interpreting the

Constitution, not all history is created equal." *Id*. at 2136. That is why courts "must … guard against giving postenactment history more weight than it can rightly bear." *Id*. "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms 'took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.' " *Id*. at 2137 (quoting *Heller*, 554 U.S. at 614). In fact, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id*.

The district court acknowledged that in light of these passages, it could "afford later history little weight 'when it contradicts earlier evidence,' " and that " 'to the extent later history contradicts what the text says, the text controls,' " App.25 (quoting *Bruen*, 142 S. Ct. at 2137, 2154). Yet it ultimately held that Delaware was likely to bear its burden of justifying the challenged bans *based entirely* on various categories of historical laws dating, respectively, (1) "[b]etween 1837 and 1925," (2) "[s]tarting in 1862," (3) "between 1850 and 1900," (4) "[a]fter the Civil War," and (5) "[a]fter [World War I]," *see* App.29–31—even though those late-breaking laws quite evidently "contradict[ ] earlier evidence," *Bruen*, 142 S. Ct. at 2121, that during the Founding and Early Republic *no jurisdiction enacted any sort of general ban on firearms in common use*. That was error.

3.     The district court further erred by allowing the State to help itself to a lower burden of justification by invoking *Bruen*'s discussion of "cases implicating unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. This case involves neither.

As for "societal concerns," this case involves the same concern as *Heller* and *Bruen*—firearm violence—and it is far from "unprecedented." *Id.* Firearm violence is "a general societal problem that has persisted since the 18th century." *Id.* at 2131. Indeed, for most of the seventeenth century, the "peacetime murder rate for adult colonists . . . ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States" in 2009. RANDOLPH ROTH, AMERICAN HOMICIDE 27 (2009). Yet the Founders responded to the problem of violence *not* by *banning common firearms*, but by *constitutionally enshrining the right to keep and bear them*. The fact that Delaware has "addressed a perceived social problem" that has widely existed since the Founding in a way "that the Founders themselves could have" done but did not conclusively shows that Delaware's bans cannot be justified as "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2131, 2135.

Mass public killings were also a familiar social problem at the Founding. For example, "[i]t is difficult for modern Americans to appreciate the acute, consuming fear of 'Indian raids' held by early Americans." STEPHEN P. HALBROOK, THE RIGHT

TO BEAR ARMS 131 (2021); *see also* Tr. of Oral Arg. at 8:14–16, *Heller*, No. 07-290 (U.S. Mar. 18, 2008), https://bit.ly/3pwNbD9, (Kennedy, J.) (observing that the American colonist carried arms "to defend himself and his family against hostile Indian tribes" in addition to "outlaws, wolves and bears . . . and things like that"). "After clashes in western Virginia in 1774, James Madison wrote that the attacking Indians were 'determined in the extirpation of the inhabitants.' " HALBROOK, THE RIGHT TO BEAR ARMS 131 (cleaned up). And John Adams described in 1775 how "New-Englandmen" were "habituated . . . to carry their fuzees or rifles upon one shoulder to defend themselves against the Indians, while they carry'd their axes, scythes and hoes upon the other to till the ground." John Adams, Letter To the Inhabitants of the Colony of Massachusetts-Bay, FOUNDERS ONLINE (Feb. 6, 1775), https://bit.ly/2SwaXi4. It was recognized, moreover, that the threat was greatest in public spaces, such as places of worship, where large groups of people gathered. Yet again, the approach that the Founders "adopted to confront that problem," *Bruen*, 142 S. Ct. at 2131, could not have been more different than the bans challenged here: in colony after colony, the Founders responded to the threat of mass public violence by *requiring* law-abiding citizens to bring firearms to those gatherings where the threat was most acute. *See* HALBROOK, *supra*, at 132–35.

Delaware also fails to show that this case implicates any "dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. There is nothing new about

firearms capable of firing more than one round without reloading. One type of firearm capable of doing so was used in Europe as early as 1339, GERALD PRENDERGHAST, REPEATING AND MULTI-FIRE WEAPONS 18–19 (2018), the Continental Congress considered purchasing "[a] musket that would quickly fire repeating shots" for use in the Revolutionary War in 1777, STEPHEN P. HALBROOK, AMERICA'S RIFLE 103 (2022); *see also* Joseph Belton, *Letter to the Continental Congress*, Apr. 11, 1777, *in* PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, vol. 1 A-B, at 139 (noting that Congress ordered one hundred rifles that could "discharge sixteen, or twenty [rounds] in sixteen, ten, or five seconds" for use in the war); 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324, 361 (1907) (noting that the deal fell through when creator Joseph Belton, demanded an "extraordinary allowance"), and an "air rifle with a twenty-two round magazine . . . proved quite useful on the Lewis and Clark Expedition in 1804," *id.* at 119. The Founders would have been well-aware that such firearms existed. And semi-automatic firearms with detachable magazines "came into wide use toward the end of the nineteenth century." *Id.* at 145.

Each of the district court's attempts to show that the firearms banned by Delaware are somehow technologically distinct from these ordinary semiautomatic firearms—that have been widely used for over a hundred years—is unpersuasive. The court thought, for example, that the banned arms "impart[ ] an 'exponentially

greater' amount of energy upon impact" because of their "high velocity," App.27–28, but according to the basic laws of physics, the force of a projectile's impact is a product not only of its velocity but *also its mass*; and because AR-15-style rifles fire relatively small .223 ammunition, the impact of a round fired from one of these arms is actually *less* than from a standard hunting rifle. *See* Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018), https://bit.ly/41mELfr; *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1052 (S.D. Cal. 2021), *vacated and remanded,* 2022 WL 3095986 (9th Cir. Aug. 1, 2022). Indeed, use of an AR-15 firing standard .223 ammunition for hunting is restricted in many States because they *are not powerful enough* to reliably take down larger game. *See, e.g.*, 2 COLO. CODE REGS. § 406-2:203(a)(1); W. VA. CODE R. 58-50-3.2.

The district court's other justifications suffer from similar flaws. For instance, while the court in one breath insisted that the banned firearms are technologically unique because of their "rate of fire," in the next breath it admitted that "it is true that, unlike a fully automatic weapon, an assault weapon can only fire as often as a person can pull its trigger." App.28 (cleaned up). The court also stated that the banned arms "are designed for long-range use." *Id.* Yes, and so are *all rifles*.

The district court's description of the banned arms as having "exceptional lethality," App.29, fails on every conceivable measure. The banned semiautomatic

firearms do not have any greater range or firepower than ordinary hunting rifles; they fire only one round at a time just like every other semi-automatic firearm; and as noted above, they are accountable for a *minuscule* amount of gun deaths, compared to handguns generally.

In truth, on the face of Delaware's ban, it singles out so-called "assault weapons" not because of their "lethality," "high velocity," "range," or "rate of fire," but rather because they possess one or more features, including "[a] folding or telescoping stock," "a pistol grip" or "thumbhole stock," or "[a] flash suppressor." DEL. CODE ANN. tit. 11, § 1465(6)(a). Any suggestion that these features constitute "dramatic technological changes" justifying greater regulation, *Bruen*, 142 S. Ct. at 2132, is completely untenable. Indeed, to the extent that these features have any functional effect at all, they tend to *improve* the firearm's utility and safety for self-defense, recreational shooting and other lawful purposes. *See* E. Gregory Wallace, *Assault Weapon Myths*, 43 S. ILL. U. L. J. 193, 228–234 (2018)

A pistol grip, for example, makes it easier to hold and stabilize a rifle or shotgun when fired from the shoulder and therefore promotes accuracy. *See id.* at 228; *see also* Kopel, *Rational Basis* at 396. A thumbhole stock is literally nothing more than an ordinary stock with a hole drilled through the grip area. It promotes accuracy by improving comfort and stability in handling a firearm. A telescoping or folding stock is merely an adjustable shoulder stock, which allows a person to

change the length of his gun to fit his stature, in the same way that he can change the height of an adjustable office chair; since some people have shorter arms than others, it promotes accuracy by allowing the stock to be adjusted to fit the individual user's physique, thickness of clothing, and shooting position. Wallace, *Myths*, *supra*, at 232; AMERICA'S RIFLE, *supra*, at 8. And a flash suppressor is merely a device that reduces the flash of light from firing a round, "prevent[ing] the night-time home defender from being blinded by her own muzzle flash." *Miller*, 542 F. Supp. 3d at 1035; *see also* Wallace, *Myths*, *supra* at 233–34. These features do not amount to the type of "dramatic technological changes" contemplated by *Bruen*. 142 S. Ct. at 2132, which cannot have been referring to changes in arms technology, since the "common use" test inherently accounts for such changes by looking to arms (and features of arms) that are in common use *today*.

4.      In any event, all of Delaware's historical evidence also fails on its own terms. *Bruen* demands that the State identify historical laws that are analogous in two senses: they "impose a comparable burden on the right of armed self-defense" as the challenged restriction, and "that burden is comparably justified." *Id*. at 2133. None of the historical laws identified by the State and relied upon by the district court meet these criteria.

The district court held that there is a historical pattern of "remarkably strict and wide-ranging regulation" of firearms that came about "when they entered

society, proliferated, and resulted in violence, harm, or contributed to criminality." App.31. This gloss on our nation's history significantly overstates the evidence on which it is based. The actual restrictions on which the district court relied to divine this pattern were much less "strict and wide-ranging" than the Delaware bans. For instance, the district court first focused on historical laws targeting Bowie knives. By its count "[b]etween 1837 and 1925, twenty-nine states enacted laws to bar Bowie knife concealed carry. Fifteen states barred their carry altogether." App.29. That is not true. Of the fifteen states to which the State's expert pointed (throughout its analysis, the district court points repeatedly to the state's expert's analysis of the relevant laws, rather than the laws themselves) as banning carry of Bowie knives altogether, three merely banned concealed carry or open carry with intent to use the knife in a crime. Colo. Rev. Stat. 1774, § 248 (1881); 1859 Ind. Acts. 129; George R. Donnan, Ann. Code of Crim. P. & Penal Code of the State of N.Y. as Amended 1882-5, § 410 (1885), two others applied only to certain "sensitive places" or on days of elections, 1870 La. Acts 159-60; James H. Shankland, Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code, at 108 (1869), and six others did not apply statewide but were limited to certain localities (and even in those localities, some of these were still not the broad bans on carry for which the district court mistook them), Joplin Code of 1917, art. 67, § 1201 (Joplin, also only applied to certain "sensitive places"); William King

McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix, 340–41 (1881) (Nashville); Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, 364-65 (1893) (Nashville); Gilbert B. Colfield, Laws, Ordinances, and Rules of Nebraska City, Otoe County at 36 (1872) (Nebraska City, also notably prohibited all carriage even of rifles, muskets, and pistols, plainly unconstitutional under *Bruen*); Charter and Revised Ordinances of Boise City, Idaho 119-20 (1894) (Boise, permitted carrying while traveling); Revised Ordinances of Provo City, Containing All The Ordinances In Force 105, 106-107 (1877) (Provo). One cited law only applied to those who were engaged in the illegal transport of alcohol. 1923 Mo. Laws 24-42. Several others were mere "territorial restrictions" which *Bruen* discounted because they were frequently short lived, rarely tested in court, and irrelevant to the vast majority of the country at the time they were in force, *Bruen*, 142 S. Ct. at 2154–55; *see* 1889 Ariz. Sess. Laws 16; 1890 Okla. Laws 495; 1913 Haw. Rev. Laws ch. 209 (also contained exception for those "authorized by law"); and one Hawaiian law predates Hawaii even having territory status, 1852 Haw. Sess. Laws 19. In the end, far from the fifteen the district court relied upon, the State has presented evidence of just *three* states that actually prohibited all forms of carry of Bowie knives—Arkansas, Texas, and West Virginia.

Even accepting that these states really did significantly restrict carry of Bowie knives, three outliers (including two states whose laws were also rejected as outliers by the Supreme Court in *Bruen*, *see* 142 S. Ct. at 2153), all post-dating the Civil War, are not enough to establish a national historical tradition of regulation. And in any event, these few laws do not impose a "comparable burden on the right" to Delaware's firearm and magazine bans, since the historical restrictions did not bar *possession*, as Delaware's laws do. Furthermore, there is significant evidence that the more onerous restrictions on Bowie knives were understood to violate the right to bear arms for self-defense unless they could be given a narrow construction. *See Nunn v. Georgia*, 1 Ga. 243 (1846); *see also Heller*, 554 U.S. at 612, 626, 629 (singling out *Nunn* as "particularly instructive" regarding the meaning of the Second Amendment). The district court erred in relying on these laws for support.

The district court also cited historical laws from the latter half of the nineteenth century "target[ing] the billy club" and the "slungshot." App.30. The State's expert purported to collect such laws as well, *see* App.411, but again, the laws were nowhere near as restrictive as Delaware's bans, and many did not operate even to entirely forbid carry but merely regulated its method, *see* 1872 Md. Laws 57 (billy club *concealed* carriage prohibited, but only in Annapolis); 1873 Ala. Offenses Against Public Justice § 4110 (prohibiting *concealed* carriage of brass knuckles and slung-shots). Both the district court and the State discussed these laws at a high level

of generality, but a closer look shows that these varying laws, which in many cases did not even entirely forbid carriage of the subject weapons, cannot support the State's flat ban on possession.

The district court's reliance on anti-revolver laws is similarly misplaced: The court claimed that revolvers entered the civilian market after the Civil War and their spread was quickly cracked down on by the enactment of concealed carry restrictions "and, by the early 1900s, at least six states barred possession of these weapons outright." App.30. The district court was, again, just wrong on the history, having been misled by the inaccurate report of the State's expert. Of the six states that supposedly barred possession of revolvers, *see* App.326, California merely criminalized possession "with intent to use the same unlawfully against another," 1917 Cal. Sess. Laws 221–225, § 5, and possession by felons, 1923 Cal. Stat. 695. Illinois only criminalized possession of "any slung-shot or metallic knuckles, or other deadl[y] weapon of like character," Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885), but said nothing at all about revolvers or other pistols. Kansas banned possession of pistols or revolvers by minors, *see* 1883 Kan. Sess. Laws 159, §§ 1–2, South Carolina prohibited selling to pistols to minors, or parents giving pistols to minors under 12, *see* 1923 S.C. Acts 221, and New York banned minors from possessing pistols *in public*, *see* George R. Donnan, Ann. Code of Crim. P. & Penal Code of the State of N.Y. as Amended 1882-5, § 410 (1885).

None restricted adults in the same way. These are particularly egregious errors given that the state's expert specifically claimed he had excluded "laws that barred weapons possession to specific groups" including "minors." App.326. Another New York law barred possession with intent to use unlawfully "[g]lass [p]istols." 1931 N.Y. Laws 1033, ch. 435, § 1. North Dakota and Council Bluffs, Iowa, prohibited concealed carry of pistols, but did not bar their possession or open carriage. 1915 N.D. Laws 96, ch. 83, §§ 1–3, 5; Geoffrey Andrew Holmes, Compiled Ords. of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized Under the Laws of Iowa 206–07 (1887).

So, contrary to the district court's conclusion, *zero* states barred possession of revolvers during this time. That should be no great surprise. After all, both *Bruen* and *Heller* unequivocally stated that pistols, including revolvers, are protected arms under the Second Amendment and "history reveals a consensus that States could *not* ban public carry [of them] altogether," let alone ban their possession. *Bruen*, 142 S. Ct. at 2146. And the district court was wrong to overread the importance of concealed carry restrictions, which permit possession and even open carriage in public. Such restrictions do not suggest that firearms that are so regulated are not protected by the Second Amendment and laws that go *further* to restrict them cannot be excused on that basis. If that were the case, *Bruen* would have been decided in favor of New York. *See id.* at 2146–47.

It was only in discussing fully automatic firearms, and laws restricting ammunition feeding devices, that the district court hit on a set of laws that are as restrictive as Delaware's weapon bans. App.30–32. Such laws really did ban possession of certain firearms, but as discussed above, bans on possession of machine guns are irrelevant because these firearms are *not* the same as semiautomatic firearms. Indeed, the Supreme Court has identified the line between semiautomatic and automatic as key in determining whether a firearm is of a type traditionally "accepted as lawful." *See Staples*, 511 U.S. at 612. As to the laws regulating semiautomatics with a given magazine capacity, the State points to ten states and the District of Columbia which it claims banned semiautomatic firearms holding more than a certain number of rounds, and four states banning "all firearms" capable of using certain round-feeding devices. App.338. As to the second set of states, the laws do not apply to "all firearms" but only to "machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously" and so they are disanalogous. 1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; 1933 Wash. Sess. Laws 335. That leaves the other eleven, and of those, one law did not ban semiautomatics, it just required a permit, *see* 1933 Ohio Laws 189-90, two laws permitted ordinary possession but banned possession for an "offensive or aggressive purpose," 1933 S.D. Sess. Laws 245-47; 1934 Va. Acts 137-39, two laws  only applied to machine guns capable of automatic fire, 1927

Mass. Acts 416, 1933 Cal. Stat. 1169, and two were limited to ammunition capacity of firearms used in hunting, 1920 N.J. Laws 67, ch. 31, § 9; 1917 N.C. Sess. Laws 390, ch. 209, § 1. Another law reached semiautomatics only if they were "changed, altered or modified" from their original design to increase their capacity. 1933 Minn. Laws ch. 190.

Only a very small number of jurisdictions banned semiautomatic firearms based on capacity. *See* 1932, Public-No. 275-72D (District of Columbia) (12 rounds without reloading); 1927 Mich. Pub. Acts 888-89 (16 rounds); 1927 R.I. Pub Laws 256 (12 rounds). Of these laws that most stringently restricted possession of semiautomatic firearms, only the D.C. law was not repealed. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 263. In other words, the State has failed to show an enduring tradition of lawful restriction on the right to own a commonly possessed firearm, and the Delaware bans are unconstitutional.

To summarize, the district court claimed to find a robust tradition of cracking down on relatively new firearms technology after it has proliferated to a point where the firearms are deemed problematic by the states, but that conclusion was based on dozens of laws that simply do not say what the district court and the State claim they say. The district court erred again by equating the burden placed on the Second Amendment right by, and the motivation for, these (misunderstood) laws to the burden and motivation for the Delaware bans. In the district court's view, even the

total ban of some of the most popular firearms and firearm magazines in the country is only a "slight" burden on the Second Amendment right because the banned magazines are "unnecessary for self-defense as individuals in self-defense situations rarely fire even 10 rounds" and "assault weapons . . . too, are rarely used defensively." App.33. The court also considered many of the past laws to be more burdensome since they sometimes targeted a wider variety of weapons. *Id.* But *Heller* forecloses this line of reasoning. In *Heller* the very same arguments were made in reverse, as petitioners tried to show that *rifles* are good for self-defense while *handguns* are ill-suited for it, but the Court rejected this argument out of hand: "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629. It cannot be the case, that if a firearm is not "dangerous and unusual," and therefore its ownership is protected by the Second Amendment, a ban on its possession is a "slight" burden on the right. That experts, the State of Delaware, or the district court considered the firearms not to be suitable, or even "unnecessary for self-defense," App.23, is *irrelevant*. In *Heller*, faced with virtually identical arguments about handguns*, see, e.g.*, Violence Policy Center and the Police Chiefs of Los Angeles, Minneapolis, and Seattle as *Amici Curiae* in Support of Pet'rs, 2008 WL 136348 at *29–30, *District of Columbia v. Heller*, No. 07-290 (Jan. 11, 2008) ("[T]he handgun is the *least* effective firearm for self-defense for all but a small

group of exceptionally well-trained individuals. . . . [S]hotguns and rifles are much more effective."), the Supreme Court listed "many reasons that a citizen may prefer a handgun" but found the actual reason immaterial, *Heller*, 554 U.S. at 629. What mattered was that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* Because the American people have chosen the AR-15 and similar firearms, as well as magazines with greater than 17-round capacity in large numbers, Delaware's ban of those protected arms cannot be considered a "slight" burden on the right.

Nor is the burden comparably justified. The district court argued that the Delaware bans, "like the historical regulations discussed by Defendants, were enacted in response to pressing public safety concerns regarding weapons determined to be dangerous." App.33. The Court also noted that the Delaware bans "responded to a recent rise in mass shooting incidents, the connection between those incidents and assault weapons and LCMs, and the destructive nature of those weapons." *Id.* Though the district court disclaimed it was doing so, this is precisely the sort of analysis *Bruen* warned against when it explained that its opinion should not be read to permit courts to "engage in independent means-end scrutiny under the guise of an analogical inquiry." 142 S. Ct. at 2133 n.7. Indeed, this sort of analysis is *worse* than the old means-end test because there, at least, the question of whether there really is a connection between the banned arms and "a recent rise in mass

shooting incidents" would be tested (and it would be found there is no such connection, *see Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (Jan. 10, 2023), https://bit.ly/3mR58uT). Instead, the district court uncritically accepted the link claimed by the state, and furthermore declared it as "similar" to historical regulations which it suggested were also based on public safety concerns. Such broad generalizations about the motivations of both present and past firearms laws would presumably excuse any sort of firearm ban— indeed, it is hard to see how they would not likewise excuse the handgun ban in *Heller*.

## IV.    The remaining injunction factors favor granting preliminary relief.

The district court's incorrect conclusion that Plaintiffs were not likely to succeed on the merits also influenced its decision that they did not face irreparable harm since, *inter alia*, "Plaintiffs have furnished no evidence that they cannot adequately defend themselves without the regulated weapons." App.36. But that would not be the question if the court had correctly found that Plaintiffs' constitutional rights were being violated. Deprivation of a constitutional right is *per se* irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971); *Ezell*, 651 F.3d at 699 ("Infringements of this [Second Amendment] right cannot be compensated by damages."). That each Plaintiff is currently enduring the irreparable

harm of being deprived of Second Amendment rights weighs in favor of granting an injunction.

So too, do the balance of the equities and the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers*, 710 F.3d at 114; *see also Wrenn v. Dist. of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017). On the other side of the scale, Delaware suffers little harm in the event that injunctive relief is granted to Plaintiffs—that would just return the status quo that reigned until June 2020.

## CONCLUSION

For the foregoing reasons, this Court should reverse the order of the district court and remand with instructions to preliminarily enjoin Delaware's bans on popular semiautomatic firearms and magazines.

Dated: July 3, 2023                    Respectfully submitted,

Bradley P. Lehman                      /s/ David H. Thompson
GELLERT SCALI BUSENKELL                David H. Thompson
  & BROWN LLC                          Peter A. Patterson
1201 N. Orange Street, Ste. 300        John D. Ohlendorf
Wilmington, DE 19801                   William V. Bergstrom
Tel: (302) 425-5800                    COOPER & KIRK, PLLC
Fax: (302) 425-5814                    1523 New Hampshire Avenue, N.W.
blehman@gsbblaw.com                    Washington, D.C. 20036
                                       Tel: (202) 220-9600
                                       Fax: (202) 220-9601

dthompson@cooperkirk.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that I am a member of the bar of this Court.

Dated: July 3, 2023

s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,936 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies supplied to the Court.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: July 3, 2023

s/ David H. Thompson
David H. Thompson
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on July 3, 2023. Service on all counsel for all parties has been accomplished via ECF.


Dated: July 3, 2023

s/ David H. Thompson
David H. Thompson
*Attorney for Plaintiffs-Appellants*