Nos. 23-1633, 23-1634, 23-1641

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

DELAWARE STATE SPORTSMENS ASSOCIATION INC., et al.,

*Plaintiffs-Appellants*,

v.

DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Delaware,
Nos. 1:22-cv-00951, 1:22-cv-01500, 1:23-cv-00033

# BRIEF FOR *AMICUS CURIAE* NATIONAL SHOOTING SPORTS FOUNDATION, INC., IN SUPPORT OF APPELLANTS

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

July 10, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), *amicus curiae* the National Shooting Sports Foundation, Inc., certifies that it does not have a parent corporation and no publicly held corporation owns ten percent or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................ i

TABLE OF AUTHORITIES .................................................................................... iii

STATEMENT OF INTEREST ................................................................................. 1

INTRODUCTION ................................................................................................... 2

BACKGROUND ..................................................................................................... 6

ARGUMENT ........................................................................................................... 8

I.    The Firearms And Feeding Devices Delaware Now Bans Are "Arms." ............................................................................................................ 8

II.   The Arms Delaware Has Banned Are Typically Possessed By Law-Abiding Citizens For Lawful Purposes, Including Self-Defense. ................ 11

III.  There Is No Historical Tradition In This Country Of Banning Arms Commonly Kept And Borne For Lawful Purposes. .................................... 18

CONCLUSION ....................................................................................................... 26

CERTIFICATE OF BAR MEMERSHIP

CERTIFICATE OF COMPLIANCE WITH WORD COUNT

IDENTICAL PDF AND HARD COPY CERTIFICATE

VIRUS SCAN CERTIFICATE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Nat'l Advertisers, Inc. v. FTC*,
  627 F.2d 1151 (D.C. Cir. 1979)...........................................................................17

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen.*,
  910 F.3d 106 (3d Cir. 2018)........................................................... 8, 10

*Banta v. Ferguson*,
  No. 2:23-cv-00112 (E.D. Wash. filed Apr. 25, 2023) ...........................................1

*Barnett v. Raoul*,
  2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) .......................................................23

*Barnett v. Raoul*,
  No. 23-1825 (7th Cir. argument held June 29, 2023) ...........................................1

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016)............................................................... 12, 13, 20

*District of Columbia v. Heller*,
  554 U.S. 570 (2008)................................................................... *passim*

*Eyre v. Rosenblum*,
  No. 3:22-cv-01862 (D. Or. filed Dec. 1, 2022) ...................................................1

*Jackson v. City & Cnty. of S.F.*,
  746 F.3d 953 (9th Cir. 2014)..............................................................10

*Landell v. Sorrell*,
  382 F.3d 91 (2d Cir. 2004)..................................................................17

*Miller v. Bonta*,
  542 F.Supp.3d 1009 (S.D. Cal. 2021)..................................................... 13, 25

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S.Ct. 2111 (2022) ................................................................. *passim*

*Range v. Att'y Gen.*,
  69 F.4th 96 (3d Cir. 2023)...................................................8, 9, 11, 21

*Se. Promotions Ltd. v. Conrad*,
    420 U.S. 546 (1975) ..................................................................................16

*Staples v. United States*,
    511 U.S. 600 (1994) ................................................................. 2, 12, 24

**Constitutional Provision**

U.S. Const. amend. II .................................................................................. 8

**Statutes and Regulation**

11 Del. Code Ann. §1465 ............................................................................1

11 Del. Code Ann. §1465(2) ........................................................................6

11 Del. Code Ann. §1465(3) ........................................................................6

11 Del. Code Ann. §1465(6) .....................................................................6, 7

11 Del. Code Ann. §1466 ............................................................................1

11 Del. Code Ann. §1466(a) ........................................................................6

11 Del. Code Ann. §1466(b) ........................................................................7

11 Del. Code Ann. §1466(d) ........................................................................7

11 Del. Code Ann. §1468 ............................................................................1

11 Del. Code Ann. §1468(2) ........................................................................7

11 Del. Code Ann. §1469 ............................................................................1

11 Del. Code Ann. §1469(a) ........................................................................7

11 Del. Code Ann. §1469(b) ........................................................................7

11 Del. Code Ann. §1469(c) ........................................................................ 8

86 Fed. Reg. 30,826 (2021) ...................................................................... 16

## Other Authorities

Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*,
Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX ................................... 16

Decl. of Brian DeLay, *Barnett v. Raoul*, No. 23-cv-209
(S.D. Ill. Mar. 2, 2023), Dkt.37-13 .................................................................... 24

William English, PhD, 2021 *National Firearms Survey: Updated
Analysis Including Types of Firearms Owned* (May 13, 2022) .................. 13, 17

Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups
on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB .................. 13

Ben Johnson, *ATF announces pistol brace ban affecting millions of
gun owners*, Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN ................... 16

David B. Kopel, *The History of Firearm Magazines and Magazine
Prohibitions*, 78 Alb. L. Rev. 849 (2015) ........................................................... 17

NSSF, *2021 Firearms Retailer Survey Report*, https://bit.ly/3CXJwC1 .................. 6

NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in
Circulation* (July 20, 2022), https://bit.ly/3zKDFh4 .......................................... 12

NSSF, *Firearm Production in the United States* (2020),
https://bit.ly/3jfDUMt ........................................................................................ 17

Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll
of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023).............................. 13

## STATEMENT OF INTEREST[1]

The National Shooting Sports Foundation ("NSSF") is the national trade association for the firearm, ammunition, hunting, and shooting sports industry. NSSF's interest in this case is manifest.  Delaware recently enacted two sweeping laws outlawing the manufacture, sale, purchase, transport, and even mere possession of arms commonly owned by law-abiding citizens for self-defense and other lawful purposes.  *See* 11 Del. Code Ann. §§1465, 1466 (ban on so-called "assault weapons"); *id.* §§1468, 1469 (ban on so-called "large-capacity magazines").  Among NSSF's approximately 10,000 members are the leading manufacturers of these and other constitutionally protected products, as well as thousands of licensed retailers both in and out of Delaware, which is why NSSF has filed suit to challenge the constitutionality of various materially similar laws other states recently enacted in the wake of *Bruen*.  *See, e.g.*, *Barnett v. Raoul*, No. 23-1825 (7th Cir. argument held June 29, 2023); *Banta v. Ferguson*, No. 2:23-cv-00112 (E.D. Wash. filed Apr. 25, 2023); *Eyre v. Rosenblum*, No. 3:22-cv-01862 (D. Or. filed Dec. 1, 2022).

---

[1] No counsel for a party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

The Supreme Court made clear just last year that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S.Ct. 2111, 2128 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).  Rather than respect that loud-and-clear message, Delaware sprung into action to impose sweeping new bans covering myriad models of firearms that are more common than the most popular vehicle in the United States, as well as ammunition feeding devices that are ten times more common than even that.  As their ubiquity indicates, these are not newfangled innovations that demand novel government intervention.  Semiautomatic firearms have been around for generations, as have magazines that hold more than 17 rounds of ammunition.  As recently as just a few decades ago, it was common ground that these common arms are "lawful," *Staples v. United States*, 511 U.S. 600, 612 (1994), and millions of law-abiding Americas continue to legally possess them.

Slapping the term "assault weapon" on firearms owned by millions does not take them outside of the Second Amendment's protection.  Nor does labeling standard-issue feeding devices "large capacity magazine[s]" change the fact that tens of millions of Americans own hundreds of millions of them as integral components of arms kept and borne for self-defense and other lawful purposes like target shooting and hunting.  The arms that Delaware newly outlawed in the wake of *Bruen*

are not just in common use; they are among the most popular arms in the country. The state's sweeping bans on these common arms are profoundly out of step with our Nation's history of firearm regulation.

*Bruen* starts the analysis with the plain text, and it made clear beyond cavil what the term "Arms" in the Second Amendment "covers":  all bearable "instruments that facilitate armed self-defense."  142 S.Ct. at 2132; *see also Heller*, 554 U.S. at 582 ("the Second Amendment extends, prima facie, to all instruments that constitute bearable arms").  Rifles, pistols, and shotguns obviously satisfy "that general definition," *Bruen*, 142 S.Ct. at 2132, and they do not somehow cease being "bearable arms" simply because they are equipped with a pistol grip or any of the other common features Delaware has deemed nefarious.  Nor do ammunition feeding devices—integral components of the firing mechanism for all semiautomatic firearms—cease being a bearable arm if they exceed a certain capacity.

To be sure, the rule that all things that "constitute bearable arms" are presumptively protected, *see id.* at 2126, 2132, does not mean that the Constitution guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Heller*, 554 U.S. at 626.  Some things that are presumptively protected under the broad textual definition of "Arms" nevertheless may be prohibited consistent with the Nation's historical tradition.  But *Bruen* also made clear what that historical tradition is:  While the Second

Amendment protects the keeping and bearing "of weapons that are … 'in common use,'" it does not protect arms that "'are highly unusual in society at large.'"  142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  Whatever else may be said of the arms Delaware has banned, there can be no serious dispute that they are "typically possessed by law-abiding citizens for lawful purposes."  *Heller*, 554 U.S. at 625.  Indeed, millions of law-abiding citizens possess the semiautomatic firearms and the standard-issue feeding devices that Delaware has banned in the tens of millions.

     The district court started off on the right foot, agreeing with almost all of this.  The court easily concluded that both the rifles and feeding devices Delaware now bans are considered "Arms" and are "in common use."  But despite finding that most of the arms Delaware now bans are commonly owned for lawful purposes and thus not "dangerous and unusual," the court nevertheless ruled that all of them may be prohibited because of how those bent on committing heinous crimes may misuse them.  That is not how the *Bruen* analysis works.  It is not open to lower courts to withhold constitutional protection based on the relative "dangerousness" of arms when used for *unlawful* purposes.  *Bruen* definitively foreclosed such an inquiry for arms in lawful common use.  The only question under binding Supreme Court precedent is whether law-abiding citizens typically keep and bear the arms at issue for lawful purposes.  And when it comes to the exceedingly broad range of arms that Delaware has banned, even the district court agreed that the answer is plainly yes.

Under a proper application of *Bruen*, that is the end of the analysis. There is no need to conduct any further historical inquiry because the Supreme Court has already determined that this is the "historical tradition" of our Nation: The government may not ban arms that are "in common use today." *Bruen*, 142 S.Ct. at 2143. In all events, the historical laws to which the district court pointed do not help the state's cause, as they predominantly involve restrictions on things like "melee weapons" and machine guns—i.e., arms *not* commonly possessed by law-abiding citizens for lawful purposes. Yet *Bruen* was clear that pointing to historical restrictions on arms that were "considered 'dangerous and unusual'" *at the time* "provide[s] no justification for laws restricting … weapons that are unquestionably in common use *today*." *Id.* (emphasis added). For when it comes to classes of arms, like the ones Delaware now bans, that law-abiding citizens have overwhelmingly chosen for lawful purposes, "American governments simply have not broadly prohibited the[ir] public carry," let alone their private possession. *Id.* at 2156.

In short, while there is a long tradition of law-abiding citizens keeping and bearing for lawful purposes the types of arms that Delaware now prohibits, there is no similar tradition of government regulation of these commonly owned arms—let alone of outright banning them. The district court's contrary conclusion cannot be reconciled with *Bruen*. It should be reversed, and the Delaware bans enjoined.

## BACKGROUND

On June 30, 2022, just days after *Bruen*, Delaware enacted two laws that together ban some of the most common arms in modern America. House Bill 450 ("HB 450") is Delaware's so-called "assault weapon" ban, and Senate Substitute 1 for Senate Bill 6 ("SB 6") bans so-called "large capacity magazines." Op.2.

HB 450 makes it unlawful to "[m]anufacture, sell, offer to sell, transfer, purchase, receive, or possess an assault weapon," 11 Del. Code Ann. §1466(a), and defines "assault weapons" exceedingly broadly. To start, dozens of models of semiautomatic rifles are banned by name. *Id.* §1465(2). HB 450 then sweeps in what it calls "copycat weapon[s]," a category defined to include any "semiautomatic, centerfire rifle that can accept a detachable magazine" and has one of five features, including those as banal and benign as "a pistol grip." *Id.* §1465(6). That definition alone captures approximately 20% of all firearms (and a majority of the rifles) sold in the United States in 2020, because it sweeps in all rifles on the AR platform. *See* NSSF, *2021 Firearms Retailer Survey Report* 9, https://bit.ly/3CXJwC1.

Delaware did not stop there. In addition to banning most modern *rifles*, the statute bans many common semiautomatic *pistols*. Once again, HB 450 starts by banning various pistols by name, 11 Del. Code Ann. §1465(3), and then goes on to ban any "semiautomatic pistol that can accept a detachable magazine and has at least 1 of" the "ability to accept a detachable ammunition magazine that attaches at some

location outside of the pistol grip," a "threaded barrel," a "shroud … that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel," or a "second hand grip." *Id*. §1465(6)(c). It further bans any "semiautomatic pistol with a fixed magazine that can accept more than 17 rounds." *Id*. §1465(6)(g). And it outlaws many commonplace shotguns too. *Id.* §1465(6)(d)-(f).

HB 450 criminalizes the possession of all of these arms as a class D felony. *Id.* §1466(d); *see id.* §1466(b)(1), (4), (7-8) (exemptions for government personnel, members of the armed forces, law enforcement, and armored car guards). Those who lawfully acquired an "assault weapon" before the statute's enactment may continue to keep them but are severely restricted in how and where such arms may be borne. Lawful possession of a grandfathered "assault weapon" is limited to an owner's home or place of business, a shooting range, certain approved gun shows, or while transporting between these limited permitted places. *Id.* §1466(b)(3).

In addition to banning many of the most common firearms in America, Delaware also enacted SB 6, which bans "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds." *Id.* §1468(2). SB 6 makes it "unlawful for a person to manufacture, sell, offer for sale, purchase, receive, transfer, or possess a large-capacity magazine." *Id.* §1469(a). A violation of these provisions is either a class B misdemeanor or a class E felony. *Id*. §1469(b)(1)-(3). SB 6 exempts many of the same individuals as HB 450, plus those

with "a valid concealed carry permit." *Id*. §1469(c)(1)-(5).  Finally, unlike HB 450, SB 6's ban on possessing "large-capacity magazines" applies even to those who possessed the now-banned magazines before its effective date (June 30, 2022).

## ARGUMENT

## I.    The Firearms And Feeding Devices Delaware Now Bans Are "Arms."

While the framework for addressing flat bans on a class of arms may not have been pellucid when this Court addressed the issue in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General* ("*ANJRPC*"), 910 F.3d 106 (3d Cir. 2018), which applied intermediate scrutiny to uphold New Jersey's ban on magazines that hold more than ten rounds, there is no longer any room for debate.  *Bruen* made clear that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126.  After *Bruen*, then, the first question in a case implicating the right to keep and bear arms is whether "the Second Amendment's plain text covers [the] conduct" the challenged law restricts.  *Id.*; *see Range v. Att'y Gen.*, 69 F.4th 96, 101 (3d Cir. 2023) (en banc).

Here, the answer to that threshold question is easy.  The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. Const. amend. II. And as *Bruen* squarely held, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 142 S.Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).  The

8

challenged laws in this case prohibit the general public—"the people" whose rights the Second Amendment secures—from acquiring various firearms and ammunition feeding devices, all of which plainly "constitute bearable arms."

Indeed, even the district court recognized that the firearms and feeding devices HB 450 and SB 6 outlaw constitute "bearable arms." Nevertheless, the court mistakenly concluded that, to be covered by the plain text of the Second Amendment and thus presumptively protected, a bearable arm must also be "in common use." Op.7-8. That confuses the *textual* inquiry under *Bruen* with the *historical tradition* inquiry under *Bruen*. *See Range*, 69 F.4th at 101 (explaining the distinction).

To be sure, the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. But that is because "historical tradition" reflects that some things that "constitute bearable arms"—i.e., weapons that "are highly unusual in society at large"—nevertheless can be prohibited. *See Bruen*, 142 S.Ct. at 2143. That does not make those things any less "Arms" under "the Second Amendment's definition," which covers all bearable "instruments that facilitate armed self-defense." *Id*. at 2132. The district court's contrary view led it to incorrectly apply the "in common use" requirement to *Bruen*'s threshold textual inquiry of whether an arm is covered by the Second Amendment. But the *textual* inquiry begins and ends

with the indisputable fact that the firearms and feeding devices Delaware now bans "constitute bearable arms" that "facilitate armed self-defense." *Id.* at 2126, 2132.

Rifles, pistols, and shotguns are obviously bearable arms that facilitate armed self-defense, regardless of what kind of grip, stock, ammunition feeding device, or other features they may have. So too are the ammunition feeding devices SB 6 bans. Magazines are not just holders of ammunition; they are integral to how semiautomatic firearms work. When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the magazine to feed a new round into the firing chamber. Citizens thus carry firearms equipped with magazines for the same reason they carry firearms loaded with ammunition: "[W]ithout bullets, the right to bear arms would be meaningless," and the central purpose of the Second Amendment—self-defense—would be eviscerated. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014). That explains why, when this Court in *ANJRPC* addressed the question of "whether a magazine is an arm under the Second Amendment," it definitively held that "[t]he answer is yes." 910 F.3d at 116. That was, and remains, the right answer. Indeed, what this Court recognized before *Bruen* is even more obviously correct in light of *Bruen*: "Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Id.*

That is true, moreover, regardless of a magazine's capacity.  *See* Op.15-16.  A bearable instrument that facilitates armed self-defense in Size Small does not cease accomplishing that end in Size Medium.  If anything, having more rounds at the ready *better* facilitates a citizen's ability to defend herself in case of confrontation, regardless of whether she ends up needing to expend every round.  Thus, both the firearms and the feeding devices that Delaware has banned are "presumptively protect[ed]" by the Constitution.  *Bruen*, 142 S.Ct. at 2126, 2132.

## II.    The Arms Delaware Has Banned Are Typically Possessed By Law-Abiding Citizens For Lawful Purposes, Including Self-Defense.

Because the firearms and feeding devices that Delaware prohibits the general public from keeping and bearing satisfy the Second Amendment's definition of "Arms," "the government now bears the burden of proof:  it 'must affirmatively prove that its … regulation[s are] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"  *Range*, 69 F.4th at 101 (quoting *Bruen*, 142 S.Ct. at 2127).  The state cannot meet that burden.  Whatever questions *Bruen* may have left open about the scope of the fundamental right the Second Amendment protects, the Supreme Court left no doubt about which "arms" may be banned outright consistent with "historical tradition":  those that are not "in common use today for self-defense" and other lawful purposes, but rather are "highly unusual in society at large."  *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  That is the irreducible minimum of the Second Amendment:  The government may

not prohibit arms that are "overwhelmingly chosen by American society for [a] lawful purpose." *Heller*, 554 U.S. at 628.

Thus, in the context of laws like HB 450 and SB 6—bans on the general public's ability to acquire arms—the only question after *Bruen* is whether the banned arms are "in common use today," i.e., "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625; *see Bruen*, 142 S.Ct. at 2134; *see also Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment) ("[T]he pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*."). If they are, then the state may not ban them—full stop.

The answer to that question is exceedingly easy here, because the firearms and magazines Delaware now bans are exceedingly common in modern America. Start with HB 450, the so-called "assault weapon" ban. The various models of rifle, pistol, and shotgun that HB 450 singles out for opprobrium are the furthest thing from "highly unusual in society at large." For instance, HB 450 effectively bans all AR-platform rifles, which the Supreme Court itself described as "widely accepted as lawful possessions" nearly three decades ago. *Staples*, 511 U.S. at 603, 612. What the Court said then is even more true today: Millions of Americans collectively own more than 24 million of these rifles. NSSF, *Commonly Owned: NSSF Announces Over 24 Million MSRs in Circulation* (July 20, 2022), https://bit.ly/3zKDFh4;

William English, PhD, 2021 *National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 2 (May 13, 2022), https://bit.ly/3HaqmKv.  That exceeds the number of Ford F-150s, America's most popular automobile, in the country.  *See* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://bit.ly/3GLUtaB.  And "the numbers have been steadily increasing."  *Miller v. Bonta*, 542 F.Supp.3d 1009, 1020, 1022 (S.D. Cal. 2021), *vacated and remanded*, 2022 WL 3095986 (9th Cir. Aug. 1, 2022).  "In 2018 alone[,] … 1,954,000 modern rifles were manufactured or imported into the United States."  *Id.* at 1022.  To state the obvious, a product lawfully owned by millions of Americans—and 20% of all gun owners, *see* Wash. Post Staff, *Sept. 30-Oct. 11, 2022, Washington Post-Ipsos poll of AR-15 owners*, https://wapo.st/3KrUouy (Mar. 26, 2023)—is about the furthest thing from "highly unusual in society at large."  *See Caetano*, 577 U.S. at 420 (Alito, J., concurring in the judgment) (finding stun guns, which "approximately 200,000 civilians" own, sufficiently "widely owned and accepted" to enjoy Second Amendment protection).

Because the district court incorrectly situated the "in common use" requirement as part of the threshold inquiry, rather than as the test for determining what arms may be banned consistent with "historical tradition," it mistakenly placed

the burden of proving commonality on the plaintiffs.[2]  *See, e.g.*, Op.12, 16-17.  But, at least as to AR-platform rifles, it still could not help but reach the right answer. The district court easily concluded, based on "ample support," that AR-platform rifles "are indeed 'in common use' for several lawful purposes, including self-defense," "recreational target shooting," "collecting, hunting, competition shooting, and professional use."  Op.12-13.  Indeed, when assessing "what the people choose for lawful purposes"—which is the only relevant legal question at this step of the analysis, Op.13; *see also Heller*, 554 U.S. at 629 ("*Whatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." (emphasis added))—the court found it indisputable that purchasers consistently report self-defense, hunting, and sport shooting as the most important reasons they purchase such rifles.  Op.12.

To say that the typical owners of AR-platform rifles and other similar firearms *typically* use them for lawful purposes is not, of course, to deny that a small number of criminals misuse these and other arms for unlawful ends.  But that was equally true—indeed, arguably more so—in *Heller*.  The *Heller* dissenters protested that

---

[2] The court also erred in suggesting that arms must be "'in common use' for self-defense" alone, as opposed to for other lawful purposes (such as hunting and sport shooting), to come within the Second Amendment's protection.  Op.10. Nevertheless, that error "d[id] not affect the outcome of the analysis," because even the district court recognized that "assault weapons" and "large-capacity magazines" are "in common use" today for the lawful purpose of self-defense.  Op.10.

handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." *Heller*, 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute the point. It just found it irrelevant to whether handguns are constitutionally protected, as that question does not turn on whether arms are misused by criminals. It turns on whether law-abiding citizens own and use them for lawful purposes. So it was enough that handguns are *typically* kept and borne for lawful purposes. *See id.* at 624-25 (majority op.).

What was true in *Heller* is no less true here, given the millions of Americans who own the rifles that HB 450 bans. HB 450's preamble focuses on mass shootings, which are unquestionably horrific. One such heinous crime is one too many. But no more than a few dozen people have ever used one of the arms HB 450 bans for such a vile end. That is less than one one-hundredth of one percent of the millions who own an AR-platform rifle. And even assuming that some additional number of Americans have misused such arms for other unlawful purposes, the unassailable reality remains that AR-platform rifles (and the other firearms Delaware has banned) are "*typically* possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25 (emphasis added). Just as in *Heller*, then, the ban here is flatly unconstitutional. After all, blanket bans such as Delaware's violate the foundational principle of our constitutional system that "a free society prefers to punish the few

15

who abuse [their] rights … after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

The other firearms banned by HB 450, while not quite as common as AR-platform rifles, are likewise "in common use" for self-defense and other lawful purposes.  In ruling otherwise, the district court assumed, based on its misreading of *Bruen*, that a plaintiff bears the burden to prove common use.  That was incorrect, as already explained.  If something is a bearable instrument that facilitates armed self-defense (as all of the firearms HB 450 bans plainly are), then the state bears the burden to show that it nonetheless can ban it consistent with historical tradition.

The state has not even tried to satisfy that burden here—likely because it cannot remotely show that the non-AR-style firearms that HB 450 bans are highly unusual in society at large.  *See, e.g.*, Ben Johnson, *ATF announces pistol brace ban affecting millions of gun owners*, Salem News Online (Jan. 31, 2023), bit.ly/42gPhEN (explaining that ownership of "pistol braces," which are most commonly used for the types of pistols HB 450 bans, is estimated to be around 10 to 40 million); 86 Fed. Reg. 30,826, 30,845-46 (2021) (ATF estimate that 3 to 7 million stabilizing braces, designed for and commonly used with AR-style pistols of the sort HB 450 bans, were sold between 2013 and 2020); Phil Bourjaily, *The Best Duck Hunting Shotguns of 2023*, Field & Stream (Mar. 20, 2023), https://bit.ly/42nqTBX (listing multiple types of shotguns HB 450 bans).  In short,

the district court was mistaken both in placing the burden on the plaintiffs and in ruling that the various pistols and shotguns HB 450 bans are not "in common use."[3]

The magazines that SB 6 bans are, if anything, even more common than the firearms that HB 450 bans.  Many of the most popular firearms in the country come standard with magazines that hold more than 17 rounds.  *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 859 (2015) ("The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds.").  Indeed, *most* modern rifle magazines have a capacity of 30 rounds.  Op.17.  One recent estimate, based on government and industry data, puts the number of rifle magazines with a capacity of at least 30 rounds sold between 1990 and 2018 at nearly *80 million*.  NSSF, *Firearm Production in the United States* 7 (2020), https://bit.ly/3jfDUMt; *see also* English, *2021 National Firearms Survey*, *supra*, at 24-25 (the average American gun owner owns more feeding devices that can hold *over* fifteen rounds than feeding devices that hold under ten rounds).  There is nothing nefarious about this.  As

---

[3] There is no need for this Court to vacate and remand for further factfinding, because the question of how many of these firearms Americans lawfully possess is a question of legislative fact that this Court is equally equipped to answer.  *See Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1163 n.24 (D.C. Cir. 1979) ("[L]egislative facts need not be developed through evidentiary hearings."); *Landell v. Sorrell*, 382 F.3d 91, 203 (2d Cir. 2004) (Winter, J., dissenting) ("[A]ppellate courts not only can find legislative facts on their own but they also usually do so.").

explained, having more rounds better facilitates one's ability to defend oneself in case of confrontation, regardless of whether one ends up needing to expend every round. In all events, there is more than "enough to show" that the magazines SB 6 outlaws are "in common use" for lawful purposes, self-defense included. Op.17.

## III. There Is No Historical Tradition In This Country Of Banning Arms Commonly Kept And Borne For Lawful Purposes.

The Court can and should end its analysis there. "[T]he traditions of the American people … demand[] our unqualified deference," *Bruen*, 142 S.Ct. at 2131, and *Bruen* made clear that the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for lawful purposes like self-defense, as opposed to arms that are "dangerous *and unusual*." In the context of a flat ban on classes of arms, that *is* the historical test—i.e., the key inquiry under *Bruen*—and it forecloses Delaware's effort to ban these commonly possessed arms. After all, a state may not prohibit what the Constitution protects.

In all events, historical regulations do not help the state anyway. While there are interesting questions about whether the proper historical framework should focus on 1791 or 1868, *see id.* at 2163 (Barrett, J., concurring), no one could credibly claim that a regulatory effort initiated in 1989 qualifies as a historical tradition of the American people. In reality, Delaware's effort to revive a recent, short-lived, and abandoned federal effort to regulate commonly owned firearms and magazines—

and to do so in the immediate wake of *Bruen*, no less—is an act of defiance, not an effort to follow any American tradition worthy of the name.

In ruling to the contrary, the district court misinterpreted *Bruen*. Because it situated the "in common use" requirement as part of the threshold textual inquiry, it failed to recognize that commonality *is* the test for the historical tradition inquiry when a state takes the radical step of banning its citizens from keeping and bearing a class of arms outright. Instead, the court insisted that the historical record supports the banning of "dangerous weapons" that "result[] in violence, harm, or contributed to criminality." Op.25. That led the court to the bizarre conclusion that even though the firearms and feeding devices that Delaware now bans are typically possessed for lawful purposes—and so are by definition not "dangerous *and* unusual"—historical traditional nevertheless allows the state to ban them because they are dangerous.

That is directly at odds with Supreme Court precedent. As noted, the majority in *Heller* did not dispute that handguns are dangerous, can be used in violence, or are the favorite weapon of criminals—factors that, under the district court's analysis, would have been sufficient to uphold a handgun ban. Yet *Heller* held that handguns are protected nonetheless, *because they are typically kept and borne for lawful purposes*. 554 U.S. at 621-36. *Bruen* confirmed the point, explaining that the reason "dangerous and unusual weapons" may constitutionally be prohibited is that a ban on such arms is "fairly supported by the historical tradition." 142 S.Ct. at 2128

(quoting *Heller*, 554 U.S. at 627). It would make no sense for the Supreme Court to have emphasized the permissibility of prohibitions on "dangerous *and* unusual" arms if dangerousness alone sufficed to support a ban. In reality, a state may not ban arms unless they are *both* dangerous (in a way different from firearms' inherent dangerousness) *and* "highly unusual in society at large." *Id.* at 2143 (quoting *Heller*, 554 U.S. at 627); *see also Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment) ("[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual.").

Nevertheless, even if the district court was correct to inquire further into historical tradition, the historical record (unsurprisingly) confirms that, for arms "in common use" like those HB 450 and SB 6 ban, there is no tradition in this country of outright bans. In fact, history reveals a long tradition of welcoming technological advancements that improve the capacity, accuracy, and functionality of arms chosen by civilians. Delaware has not come close to meeting its burden of showing a tradition of banning common arms like those that HB 450 and SB 6 outlaw.

Given that the district court misunderstood the historical tradition test, it should come as little surprise that its read of the history was similarly confused. For instance, while laws regulating "melee weapons" are indeed part of our Nation's history, Op.24, they show no more than what *Heller* and *Bruen* already said: The only types of arms that governments in this country have ever widely restricted are

those sparingly chosen by law-abiding citizens for lawful purposes, but overwhelmingly chosen by criminals for illicit ends—in other words, arms *both* dangerous *and* unusual. (Hence the moniker "*melee* weapons.")

Moreover, most of the laws the district court cited did not ban the public from acquiring the arms they regulated. Indeed, the district court openly acknowledged this, admitting that all of the nineteenth-century pistol restrictions and nearly all of the Bowie knife restrictions it cited prohibited only *concealed carry*. Op.23-24. That should have pretermitted any reliance on these historic regulations. After all, *Bruen* was crystal clear: For regulations to be considered "relevantly similar under the Second Amendment," they must, at a minimum, impose the same kind of "burden [on] a law-abiding citizen's right to armed self-defense," 142 S.Ct. at 2132-33, and "regulations targeting longstanding problems must be 'distinctly similar' to a historical analogue," *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S.Ct. at 2131). A law banning only the concealed carry of certain arms is simply not analogous in that key respect to a law that outlaws acquiring certain arms in the first place. The former prevents the public from exercising one-half of one-half of the fundamental rights the Second Amendment protects; the latter cuts off the whole thing.[4]

---

[4] The district court also cited the declaration of Robert Spitzer for the proposition that 15 states generally barred *open* carry of Bowie knives, Op.23, but Spitzer's own citations refute the point. Three of the states he cited (Colorado, Idaho, and Indiana) banned only *concealed* carry, while leaving intact the right to carry openly. *See* Dist.Ct.Dkt.40-1 at 114, 124, 127. Two (Louisiana and Missouri) banned open carry

As for the rest of the district court's historical narrative, the Supreme Court has already made clear that historic restrictions on arms considered dangerous and unusual *in the past* make no difference to the constitutionality of bans on arms *today*. "[E]ven if these colonial laws prohibited the carrying of [a certain class of arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S.Ct. at 2143 (quoting *Heller*, 554 U.S. at 627).  And because no more than a few outlier jurisdictions prohibited the general public from acquiring common arms in the 1700s or 1800s (and those few did so only briefly), nothing in the laws of the eighteenth and nineteenth century supports a ban on acquiring or even possessing arms in common use today.

Nor do things change when one fast-forwards a century or even two.  "Apart from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense," *id.* at 2156, let alone their mere acquisition or possession.  Instead, they

---

*only in sensitive places.  See id.* at 134, 147.  Three more (from New York, Nebraska, and Tennessee) were local ordinances, not statewide bans.  *See id.* at 150, 160, 178.  And four (Arizona, Hawaii, Oklahoma, and Utah) were territorial prohibitions, *see id.* at 106, 123, 167, 182, which the Supreme Court has held "deserve little weight," *Bruen*, 142 S.Ct. at 2155.  In the end, there are at most only three state laws that completely banned the open carry of Bowie knives.  And, to (re)state the obvious, that is nowhere near enough to form a genuine historical tradition—much less one sufficiently analogous to an outright ban on *both* keeping *and* bearing common arms.

have confined themselves to prohibiting only those arms that are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625.

The Prohibition-era restrictions on fully automatic firearms that the district court cited, *see* Op.24-25, fit this narrative to a T. Unlike a semiautomatic weapon, which fires only once upon each function of the trigger, the defining feature of a *fully* automatic firearm is that it fires a continuous stream of bullets while the trigger is depressed. That feature is highly useful for suppressive fire in a war zone, but far less so for personal self-defense, because it makes it much more difficult "to accurately shoot and hit [one's] intended target in case of confrontation"—and "the 'meaningful exercise' of the right to armed self-defense is wholly dependent on the ability of citizens to utilize their arms and hit their intended target." *Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023). Presumably for that very reason, Americans never chose automatic firearms en masse even before they were banned. As one of the state's historians has explained, fully automatic firearms were a commercial "failure from the start" among law-abiding citizens. Decl. of Robert J. Spitzer (Dist.Ct.Dkt.40) ¶50. While a small number of gangsters did commit headline-grabbing heinous acts with them, "[b]y 1925"—when states began to ban them—only a few thousand automatic firearms "had sold" in the United States. *Id.* Fully automatic weapons thus were the definition of "highly unusual" when American governments banned them.

That is a far cry from semiautomatic firearms capable of firing more than 17 rounds without reloading, which millions of law-abiding citizens in this country have kept and borne for self-defense and other lawful purposes *for more than a century*. As a historian offered by Illinois in a challenge to its similar bans (and by Oregon in a challenge to its magazine ban) has testified, semiautomatic technology and detachable magazines both "emerged in the 1880s and began to be integrated into firearms for the consumer market by the end of the century." Decl. of Brian DeLay ¶72, *Barnett v. Raoul*, No. 23-cv-209 (S.D. Ill. Mar. 2, 2023), Dkt.37-13; *see* Op.20 (recognizing that semiautomatic rifles "began to circulate appreciably in society" in the 1920s). That not only explains why the Supreme Court recognized in 1994 that, unlike fully automatic weapons, semiautomatics that come standard with 20- or 30-round magazines "traditionally have been widely accepted as lawful possessions" in this country, *Staples*, 511 U.S. at 612, but suffices to disprove any notion that HB 450 and SB 6 can be justified as regulations of "dramatic technological changes" that "may require a more nuanced approach," *Bruen*, 142 S.Ct. at 2132.

Finally, to the extent the district court sought to excuse the relative novelty of Delaware's ban as owing to some "unprecedented societal concern[]," *id.*, that argument fails too. Even accepting the dubious proposition that there is some causal link between the arms that have been in common use for decades and the recent horrific acts on which the district court focused, the unfortunate reality is that mass

murder has been a fact of life in the United States for a very long time. Nevertheless, before "the 1990's, there was no national history of banning weapons because they were equipped with furniture like pistol grips, collapsible stocks, flash hiders, … or barrel shrouds," *Miller*, 542 F.Supp.3d at 1024; there were almost no efforts to restrict the firing capacity of semiautomatic arms; and *no state* banned ammunition magazines of any size at all.

The district court used "unprecedented societal concerns" as an attempt to sneak means-end scrutiny through the back-door as a justification for firearm regulation. But there has never been any historical tradition of banning arms that law-abiding citizens typically keep and use for lawful purposes based on the damage they could inflict in the hands of someone bent on misusing them. To the contrary, our Nation's historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 142 S.Ct. at 2132; *Heller*, 554 U.S. at 627. Even looking past the Supreme Court's commonality test, then, there simply is no tradition of banning commonly owned semiautomatic firearms or the devices that play an integral role in how they fire by feeding ammunition to the chamber. Indeed, even today, Delaware's approach is an outlier; the vast majority of states continue to respect their citizens' rights to keep and bear the common semiautomatic firearms and even-more-common magazines

that HB 450 and SB 6 outlaw.  Because Delaware's newly enacted bans fly in the face of our Nation's historical tradition, they violate the Second Amendment.

## CONCLUSION

For the reasons set forth above and in the principal briefs filed by Appellants, this Court should reverse.

Respectfully submitted,

s/Erin E. Murphy
PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
MARIEL A. BROOKINS[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

* Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

July 10, 2023

## CERTIFICATE OF BAR MEMERSHIP

The undersigned hereby certifies pursuant to L.A.R. 46.1 that the attorney whose name appears on the Brief of Appellant was duly admitted to the Bar of the United States Court of Appeals for the Third Circuit in 2013, and is presently a member in good standing at the Bar of said Court.

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT

I hereby certify that this brief complies with the type-volume requirements and limitations of Fed. R. App. P. 32(a).  Specifically, this brief contains 6,419 words in 14-point Times New Roman font.

## IDENTICAL PDF AND HARD COPY CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the text of the electronic brief is identical to the text in the paper copies.

## VIRUS SCAN CERTIFICATE

The undersigned hereby certifies that this brief complies with L.A.R. 31.0(c) because the virus detection program Windows Security, version 4.18.2207.5, has been run on the file and no virus was detected.

s/Erin E. Murphy
Erin E. Murphy

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy