In the
# United States Court of Appeals for the Third Circuit

◆

GABRIEL GRAY, et al.,

*Appellants in No. 23-1633,*

v.

ATTORNEY GENERAL DELAWARE,

*D. Del. No. 1:22-cv-01500,*

◆

CHRISTOPHER GRAHAM, et al.,

*Appellants in No. 23-1634,*

v.

ATTORNEY GENERAL DELAWARE,

*D. Del. No. 1:23-cv-00033*

◆

On Appeal from the U.S Dist. Ct. for the Dist.
of Del. No. 1:22-cv-00951 & 1:23-cv-00033
The Honorable Richard G. Andrews

◆

### *Gray* and *Graham* Plaintiffs-Appellants' Reply Brief

◆

Bradley P. Lehman
GELLERT SCALI BUSENKELL
&  BROWN LLC
1201 N. Orange Street, Ste. 300
Wilmington, DE 19801
Tel: (302) 425-5800
Fax: (302) 425-5814
blehman@gsbblaw.com

David H. Thompson
Peter A. Patterson
William V. Bergstrom
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
Telephone: (202) 220-9600
dthompson@cooperkirk.com

*Counsel for* Gray *and* Graham *Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ...............................................................................1

ARGUMENT ......................................................................................1

  I.   The Plain Text of the Second Amendment Protects Plaintiffs' Right to Acquire and Possess the Banned Firearms and Magazines...........................1

  II.  Delaware's Bans Are Not Historically Justified. ............................................3

      A. Arms In Common Use for Lawful Purposes Cannot Be Banned. ........4

      B. The District Court Erred By Accepting the State's Misleading and Erroneous Historical Argument. ......................................................12

      C. This Case Presents Neither Unprecedented Societal Concerns Nor Dramatic Technological Changes. ......................................................18

      D. The State Has Failed to Justify Its Bans..............................................21

  III.  The Remaining Injunction Factors Favors Plaintiffs ....................................25

CONCLUSION .................................................................................26

i

# TABLE OF AUTHORITIES

**Cases**                                                                                **Page**

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
910 F.3d 106 (3d Cir. 2018) ............................................................2

*Aymette v. State*,
21 Tenn. 154 (1840) ......................................................................24

*Baird v. Bonta*, --- F.4th ----,
2023 WL 5763345 (9th Cir. 2023) ................................................25

*Caetano v. Massachusetts*,
577 U.S. 411 (2016).............................................................8, 9, 10

*Chastleton Corp. v. Sinclair*,
264 U.S. 543 (1924).......................................................................17

*Cockrum v. State*,
24 Tex. 394 (1859) ........................................................................24

*District of Columbia v. Heller*,
554 U.S. 570 (2008)............................... 3, 4, 5, 6, 7, 8, 9, 11, 24, 25

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ........................................................17

*Friedman v. City of Highland Park, Ill.*,
136 S. Ct. 447 (2015).......................................................................9

*Haynes v. Tennessee*,
24 Tenn. 120 (1844) ......................................................................24

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011).............................................6, 9, 11

*In re Asbestos Litig.*,
829 F.2d 1233 (3d Cir. 1987) ........................................................17

*Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*,
916 F.2d 1174 (7th Cir. 1990) .................................................16, 17

*Kolbe v. Hogan*,
849 F.3d 114 (4th Cir. 2017) ........................................................12

*McDonald v. City of Chicago*,
561 U.S. 742 (2010).........................................................................5

*New York State Rifle & Pistol Ass'n, Inc. v. Beach*,
  354 F. Supp. 3d 143 (N.D.N.Y. 2018) ........................................18

*New York State Rifle and Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022).............................. 3, 4, 8, 9, 11, 13, 14, 17, 18, 19, 24

*Nunn v. Georgia*,
  1 Ga. 243 (1846) ....................................................................23

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) ...............................................26

*Staples v. United States*,
  511 U.S. 600 (1994)..................................................................6

*Stenberg v. Carhart*,
  530 U.S. 914 (2000)..................................................................6

*Teter v. Lopez*,
  76 F.4th 938 (9th Cir. 2023) ...............................................4, 7

*Tripathy v. Lockwood*,
  No. 22-949-pr, 2022 WL 17751273 (2d Cir. Dec. 19, 2022).......................26

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
  508 U.S. 439 (1993)................................................................14

*United States v. Miller*,
  307 U.S. 174 (1939)................................................................25

*United States v. Singleterry*,
  29 F.3d 733 (1st Cir. 1994)......................................................17

*Worth v. Harrington*,
  No. 21-cv-1348, 2023 WL 2745673 (D. Minn. Mar. 31, 2023) ..................21

*York Risk Servs. Grp., Inc. v. Couture*,
  787 F. App'x 301 (6th Cir. 2019) ...........................................26

## Statutes and Rules

D.C. CODE ANN.
  § 7-2502.02 ............................................................................6

DEL. CODE ANN. tit. 11,
  § 1465 .....................................................................................5
  § 1466 .....................................................................................5
  § 1468 .....................................................................................5
  § 1469 .....................................................................................5

FED. R. EVID. 201 ............................................................................16, 17

**Other Authorities**

Br. for the United States of America, *District of Columbia v. Heller* (Jan. 11, 2008)
    (No. 07-290) ................................................................................18

Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from*
    *Mass Shootings Through Restrictions on Assault Weapons and Other High-*
    *Capacity Semiautomatic Firearms*,
    19 CRIM'Y & PUB. POL'Y 147 (2020).........................................................5, 6

Dave Campbell, *A Look Back at the Thompson Submachine Gun*, AMERICAN
    RIFLEMAN (Apr. 17, 2019), available at https://bit.ly/3ZlZL5y ...................10

David Kopel, *How powerful are AR rifles?,* REASON MAG. (Feb. 27, 2023)
    available at https://bit.ly/3t4Vh7g ...............................................................20

Martin L. Fackler, *Gunshot Wound Review*,
    28 ANNALS OF EMERGENCY MED. 194 (Aug. 1996) ...............................20, 21

DON TROIANI, DON TROIANI'S SOLDIERS OF THE
    AMERICAN REVOLUTION (2007).................................................................2, 3

*Inflation Calculator*, FEDERAL RESERVE BANK OF MINNEAPOLIS,
    https://bit.ly/3PoLAID ...............................................................................10

NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT:
    REGULATION, RIGHTS, AND POLICY (3d ed. 2021) ..........................................3

RANDOLPH ROTH, AMERICAN HOMICIDE (2009) .....................................................20

**INTRODUCTION**

Delaware's law banning firearms and ammunition magazines possessed by millions of Americans is flagrantly unconstitutional. Under binding Supreme Court precedent, the law-abiding citizens of this country have an absolute right to possess arms that are in common use. Arms possessed by millions easily meet that description.

The State's response primarily consists of asking the Court to ignore the "common use" test because of various shortcomings that it perceives with the test or the outcomes the test produces, but this Court must follow binding Supreme Court precedent.

The State also argues that Plaintiffs somehow waived their ability to argue about issues such as the meaning of historical statutes. Plaintiffs did not waive any such arguments, but more importantly, those arguments are largely a distraction. The district court itself held that the banned long guns and magazines are in common use. Under a straightforward application of Supreme Court precedent, it follows that the State's Bans of these items are unconstitutional even under the district court's understanding of the record. For these reasons and those explained below, this Court should reverse.

**ARGUMENT**

**I.    The Plain Text of the Second Amendment Protects Plaintiffs' Right to Acquire and Possess the Banned Firearms and Magazines.**

1

The district court correctly concluded that both the firearms and the magazines banned by Delaware are "arms" within the meaning of the Second Amendment. *See* Pls.' Opening Br., Doc. 29 at 13–15 (July 3, 2023) ("*Gray* Br."). Delaware does not dispute that the firearms it bans "belong to the broad category of weapons constituting 'bearable arms.'" *Id.* at 14 (quoting A17). It does, however, briefly argue that magazines are "accessories" or "accoutrements," not arms. State Defs.' Resp. Br., Doc. 62 at 61–62 (Aug. 16, 2023) ("State Br."). But this Court has held that "[b]ecause magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018). Although *ANJRPC*'s holding that the challenged regulation survived intermediate scrutiny was abrogated by *Bruen*, *see id.* at 119, its determination that magazines are arms was not disturbed by the Supreme Court's decision.

In any event, the State's argument is unpersuasive. It posits that magazines are mere "accessories" because on some websites selling firearms, magazines are listed as "accessories," and at the Founding "cartridge boxes" and other ammunition storage boxes were often referred to as "accoutrements" as distinct from "arms." State Br. 61; SA396 (Decl. of Dennis Baron). The retail classification of these items has no constitutional significance. Moreover, it is fallacious to compare "cartridge

boxes" to the magazine of a semiautomatic firearm. A cartridge box at the Founding was a simple container used to hold additional ammunition. *See* DON TROIANI, DON TROIANI'S SOLDIERS OF THE AMERICAN REVOLUTION 4 (2007). Magazines are integral for the operation of semiautomatic firearms and they function to both hold *and feed* ammunition into the chamber to be fired. *See* NICHOLAS J. JOHNSON ET AL., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 1978 (3d ed. 2021). One can no more consider the magazine separately from a semiautomatic firearm than the trigger or barrel.

What is more, Delaware's ban on magazines holding more than 17 rounds effectively is a ban on firearms capable of firing more than 17 rounds without reloading—in other words, by banning a certain type of *magazine*, Delaware effectively has banned a certain type of *firearm*. Since the Second Amendment extends to "all instruments that constitute bearable arms," *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), it necessarily extends to firearms capable of firing more than 17 rounds without reloading.

## II. Delaware's Bans Are Not Historically Justified.

Because the Second Amendment's plain text applies to the banned firearms and magazines, Delaware must "justify its regulation[s] by demonstrating [they are] consistent with the Nation's historical tradition of firearm regulation." *New York*

*State Rifle and Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022). It has failed to do so.

## A. Arms In Common Use for Lawful Purposes Cannot Be Banned.

*Heller* and *Bruen* establish the historical rule of decision for all arms-ban cases: arms that are "in common use" are absolutely protected and cannot be banned, a conclusion that is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *See Heller*, 554 U.S. at 627. Because "common use" is part of the historical test, the State bears the burden to show the banned firearms are not in common use, and it has failed to even attempt to do so. *See Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023). The district court correctly found that the banned long guns and magazines are in common use. A23. That should have been the end of the matter and resulted in a ruling for Plaintiffs with respect to those items. *See Gray* Br. 15–30. The State fights the governing legal standard in several ways, but all lack merit.

1.      The State asserts that "common use" only matters in cases involving an absolute ban. Its own Bans do not rise to this level, it claims, because "numerous guns of all types, including handguns, shotguns, and long guns—including semi-automatic versions—are permitted by the Statutes" and "many magazines . . . remain unaffected." State Br. 23. This is wrong for several reasons.

First, an arms ban need not be "categorical" or "absolute" to trigger the "in common use" test. Rather, any time a firearm—even just one of many similar firearms—is banned, if that arm is of a type that is "in common use," it violates the Second Amendment. This is because, as *Heller* explained, at the Founding "the traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense," so firearms "typically possessed by law-abiding citizens for lawful purposes" are protected. 554 U.S. at 624–25. And once a firearm is protected, it follows that law-abiding citizens "must be permitted to use" it. *McDonald v. City of Chicago*, 561 U.S. 742, 768 (2010) (quotation omitted). "It is no answer" that possession of other firearms is allowed. *Heller*, 554 U.S. at 629.

Second, the laws at issue *are* "absolute" or "categorical" bans; they designate categories of "assault weapons" and "large-capacity magazines," DEL. CODE ANN. tit. 11, §§ 1465, 1468, and then ban them, *see* DEL. CODE ANN. tit. 11, §§ 1466, 1469. Delaware must think there is *something* unique about these items, else banning them would be wholly irrational.

Third, while Delaware's contention that its ban is not categorical should be rejected, its argument does demonstrate that the category it has created is an artificial one. So-called "assault weapons" "do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Christopher S. Koper,

*Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM'Y & PUB. POL'Y 147, 149 (2020). The Supreme Court in *Staples v. United States* identified an AR-15, the archetypical "assault weapon" banned by Delaware under the Bans, as a type of semiautomatic firearm that "traditionally ha[d] been widely accepted as lawful possessions." 511 U.S. 600, 612 (1994); *cf. Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). By effectively conceding that the appropriate category of firearms to consider here is "semiautomatics," Delaware forecloses the conclusion that the arms it bans are not "in common use." *See, e.g., Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*").

Finally, while there are exceptions for magazines and firearms owned before the Bans' effective date, or for law enforcement officers and certain businesses, the exceptions do not permit ordinary law-abiding citizens of Delaware to acquire and possess the banned arms. *Heller* itself rejected the significance of "minor exceptions" to D.C.'s handgun ban, *see* 554 U.S. at 574 n.1, which included exceptions for pre-ban handguns and retired police officers, *see* D.C. CODE ANN. § 7-2502.02 (West 2008).

2. The State claims that whether a firearm is "in common use" goes not to the historical analysis, as Plaintiffs have explained, *see Gray* Br. 29–30, but is instead

part of the textual question: whether the items are "arms" at all. State Br. 23–24. This argument is inconsistent with the plain text of the Second Amendment—which references "arms" and nowhere suggests that there is some requirement that protected arms be sufficiently common—and with *Heller* and *Bruen*, which make clear that common use is based on history, not plain text. *See Teter*, 76 F.4th at 949–950.

Following the methodology later made explicit in *Bruen*, *Heller* began by analyzing the scope of the text of the Second Amendment. *See Heller*, 554 U.S. at 576–600. It construed the term "arms" to embrace "all instruments that constitute bearable arms," without regard to how common they are. *Id.* at 582. It then analyzed the history of firearm regulation to assess potential limits on the right and held that *history* disclosed an "important limitation on the right to keep and carry arms," namely, that "*the historical tradition* of prohibiting the carrying of 'dangerous and unusual weapons' " showed that "the sorts of weapons protected were those 'in common use.' " *Id.* at 627 (emphasis added). This was a rule developed from "*the historical understanding* of the scope of the right." *Id.* at 625 (emphasis added). The handguns that were the subject of D.C.'s ban were not "dangerous and unusual weapons," but rather "the most popular weapon chosen by Americans for self-defense in the home," so they were protected. *Id.* at 629. And in *Bruen*, as the Supreme Court set out to clarify the methodology exemplified in *Heller*, it stated

plainly that *Heller*'s conclusion that firearms "in common use" are protected by the Second Amendment was "[d]raw[n] from . . . *historical tradition*" and comported with the enactments of colonial legislatures that *Bruen* analyzed in its own historical review. 142 S. Ct. at 2143 (emphasis added).

The State argues that "common use" should be treated as an element of the text just because *Bruen* "answered the [textual] question only after noting that it was undisputed that handguns are weapons in common use today for self-defense." State Br. 24 (quoting *Bruen*, 142 S. Ct. at 2134–35) (cleaned up). But there is nothing suggestive about the placement of this statement in the opinion, which *even in the State's* telling, came before the textual analysis; it was merely a prefatory statement clarifying issues that were not in dispute in the case. *See* 554 U.S. at 584.

3. The State objects to Plaintiffs' reliance on the per curiam opinion and Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), because *Caetano* did not itself decide stun guns were constitutionally protected and Justice Alito's opinion—which applied the common use test and found 200,000 civilian owners qualified as "common" for purposes of constitutional protection— did not command a majority of the Court. State Br. 25. As to the first point, Plaintiffs acknowledged that *Caetano* did not decide the constitutionality of the Massachusetts law at issue. *See Gray* Br. 21–22. But the per curiam opinion reaffirmed that the standard to apply in arms ban cases is "common use." *See id.* at 27; *Caetano*, 577

U.S. at 411. Indeed, *Bruen* itself cited *Caetano* for that point. *See Bruen*, 142 S. Ct. at 2134. And as for Justice Alito's concurrence, he is hardly alone in recognizing the importance of *Heller*'s "in common use" language, as Justices Thomas and Kavanaugh also embraced that rationale before *Bruen*, *see Friedman v. City of Highland Park, Ill.*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from denial of certiorari); *Heller II*, 670 F.3d at 1270 (Kavanaugh, J., dissenting), as has a majority of the Court in *Bruen*, *see* 142 S. Ct. at 2143.

4.    The State warns that taking "common use" seriously will " 'upend settled law' " because " 'as of 2016, there were nearly 176,000 legal civilian-owned machine guns in the United States', which 'comes close to [200,000] the quantity of weapons that Plaintiffs [and Justice Alito in *Caetano*] . . . identify as sufficient' to immunize a weapon." State Br. 26–27 (quoting A16). But finding common use here would not bind the Court to find machine guns also in common use—it is entirely possible that 200,000 represents "the lower bar of constitutional protection." *Gray* Br. 28. The State claims Plaintiffs have "simply made up" this threshold, State Br. 27, but Plaintiffs' argument is supported by the very portions of *Heller* and *Caetano* that the State tries to contort into conflict with one another. Though it was not necessary to the Court's decision, *Heller* suggested that machine guns were unprotected by the Second Amendment under the "common use" analysis because they are "highly unusual in society at large." *Heller*, 554 U.S. at 627. *Caetano*

reversed a decision upholding a ban on stun guns as inconsistent with *Heller*, and at the time, there were approximately 200,000 stun guns in the United States. 577 U.S. at 411 (per curiam), 420 (Alito, J., concurring). Putting these things together, that suggests that there *is* in fact a "constitutionally significant difference between 200,000 and 176,000." State Br. 27.

That is especially understandable since machine guns have been on the market for much longer than stun guns and have *never* been in common use. When perhaps the most famous such firearm, the Thompson submachine gun, first appeared on the market in 1921, though "virtually anyone with cash could buy one across the counter," "[s]ales trickled in." Dave Campbell, *A Look Back at the Thompson Submachine Gun*, AMERICAN RIFLEMAN (Apr. 17, 2019), available at https://bit.ly/3ZlZL5y. At the same time, automatic firearms became "[t]he guns of choice for most [Prohibition-era] gangs." *Id.* And 13 years after the Thompson debuted, Congress passed the National Firearms Act of 1934, severely restricting the lawful possession of machine guns by subjecting them to what at the time was an exorbitant tax. *See Inflation Calculator*, FEDERAL RESERVE BANK OF MINNEAPOLIS, https://bit.ly/3PoLAID ($200 in 1934 equivalent to over $4,500 in 2023). Tasers had been around for much less time in 2009, but they already exceeded the total number of civilian-owned machine guns. *See Caetano*, 577 U.S. at 420. Of course, the numbers of both Tasers and machine guns owned by law-abiding Americans are

dwarfed by the number of magazines holding more than 17 rounds or firearms Delaware has dubbed "assault weapons," both of which are owned by *millions* of Americans, so even if the floor for common use is above 200,000, this case raises no thorny concerns about the limits of the scope of the right. *See, e.g.*, *Heller II*, 670 F.3d at 1261.

5.      The State argues that "common use" creates "a race between manufacturers and legislatures," "leads to circular analyses," and is "inconsistent with the enduring nature of constitutional principles." State Br. 28–29. None of these objections are valid. As *Bruen* readily acknowledges, enduring constitutional principles look different at different times—that is why courts must ask whether new and old laws are "relevantly similar." *Bruen*, 142 S. Ct. at 2132 (quotations omitted). In an arms ban case like this one, the question is, are these Delaware laws like "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons[?]' " *Heller*, 554 U.S. at 627. The *enduring constitutional principle* to be applied is that weapons that are not "dangerous and unusual" are protected. Although the firearms that fit that definition may change from time to time, *see Bruen*, 142 S. Ct. at 2143 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."), the principle remains the same.

As to the charge that the test is circular or creates a race between regulators and manufacturers, this objection was raised by Justice Breyer in dissent in *Heller* but "the *Heller* majority was obviously unmoved by it." *See Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017) (Traxler, J., dissenting). And as products such as Google Glass and the Ford Edsel demonstrate, producers cannot dictate to consumers what to purchase. Arms in common use are in common use because the American people have found them useful and elected to obtain them.

Finally, it is not true to suggest, as the State does, that if a state can outlaw a firearm before it comes into common use, then its regulation is *per se* valid. To be banned, a firearm must be "dangerous *and* unusual." A firearm may be infrequently owned (therefore unusual numerically) yet no more dangerous than arms that are in common use (therefore not dangerous). "Common use" is a sufficient but not necessary condition for constitutional protection.

### B. The District Court Erred By Accepting the State's Misleading and Erroneous Historical Argument.

The Court need go no further. The banned firearms and magazines are "in common use," and so Delaware's Bans are unconstitutional. If it does go further, the State urges the Court to decide the constitutionality of the Delaware Bans and make a constitutional holding based on the false assertions of its experts. The Court should decline that invitation.

The State suggests this Court must accept as true the existence of entirely fictional historical restrictions, even though Plaintiffs demonstrated in their opening brief that the historical claims made by the State are untethered from reality, *see Gray* Br. 42–53, because, it claims, Plaintiffs waived their right to object to any historical errors, State Br. 18. At oral argument on the preliminary injunction, after first noting that the contents of all the expert reports submitted by the State are *irrelevant* to the legal question in this case (since the banned firearms are in common use), Plaintiffs' counsel was asked by the district court if it could "take every factual assertion that's in the five Defendant declarations as being true," and responded "yes." SA938. Later at the same hearing, Plaintiffs' counsel affirmed that the Court did not "have to go out and do [its] own independent history." SA975. Neither statement amounts to a waiver of Plaintiffs' right to have this Court interpret the Second Amendment in light of *true* historical context.

Taking these points in reverse order, the second is an accurate statement of the law. *Bruen* affirmed that Courts do not have to go and assemble their own historical evidence to try to prove the constitutionality of a challenged law. Instead, this Court can "decide a case based on the historical record compiled by the parties," *Bruen*, 142 S. Ct. at 2130 n.6, and the State bears the burden to identify sufficient analogues to justify its law, *id.* at 2135. But what *Bruen* does not provide is that once a state comes forward with purported analogues, the court must accept a characterization

of those analogues that is refuted by the text of the laws themselves. While the Court need not do its own "history"—*i.e.*, compile its own historical analogues—it must do its own "historical analysis." "[I]t is [the job of judges] to resolve *legal* questions presented in particular cases or controversies [and] [t]hat legal inquiry is a refined subset of a broader historical inquiry." *Id.* at 2130 n.6 (quotations omitted). In other words, in deciding the legal question of the Bans' constitutionality, the Court has a duty to analyze historical restrictions on the right to make a *legal* conclusion regarding the contours of the Second Amendment. It *must* evaluate whether the laws the State cites actually are "relevantly similar" to the challenged restrictions. *Id.* at 2132 (quotations omitted). That means that if the State's expert claims that the laws he has assembled regarding possession or carriage of pistols are of general applicability and not merely "laws that barred weapon possession to specific groups," *see* A326, when in fact they *are precisely* the latter sort of law, *see Gray* Br. 46–47, it is *legal error* to take the expert's word for it. Even if Plaintiffs' counsel had fully endorsed the State's expert report (and he did not), the district court erred in basing its judgment on "a rule of law whose nonexistence is apparent on the face of things, simply because the parties [allegedly] agree[d] upon it." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quotation omitted).

Plaintiffs' briefing below also gives lie to the notion that the parties had agreed upon this error of law anyway. Plaintiffs argued there, as they have here, that the State's proffered analogues were inadequate because the State had "not identified a single law that would permit a State to outlaw possession of a 'dangerous' weapon that was among the most popular contemporary choices of citizens lawfully seeking to exercise their fundamental rights [so] [n]one of the laws cited by the State are 'relevantly similar' under *Bruen*." SA916.

As for Plaintiffs' statement that the district court could accept the "factual assertions" presented by the experts (for instance, the existence of certain historical gun laws) at face value for the purpose of deciding the preliminary injunction, it was not an invitation for the district court also to adopt the expert's inaccurate legal analysis, but rather a statement that *even if* all the experts' factual assertions were accepted, Plaintiffs would win anyway. The district court noted in its question to Plaintiffs' counsel that it "underst[ood] you don't think its relevant," and Plaintiffs' counsel emphasized in answering that "if you do [take the facts as true], your honor, it's not going to make a difference," because under the applicable legal test—common use—the State's experts simply do not matter. SA938.

Plaintiffs did not waive any objection that the expert was misrepresenting the meaning of historical laws or misstating how they compared to the Bans. And Plaintiffs are not now presenting "claims that were not first presented to the District

Court," State Br. 19 (quotation omitted), since the one and only claim in this case—that the Bans are utterly unlike historically accepted restrictions on the right to keep and bear arms—is the same here as it was below.

The State also argues that "Plaintiffs rely heavily upon purported factual assertions not presented below," and asks this Court to blind itself to any facts on appeal not found in the district court's preliminary injunction record. State Br. 20–21. As an initial matter, even if this Court were to ignore every piece of information Plaintiffs did not cite before the district court, Plaintiffs should still prevail. Plaintiffs explained to the district court, as they have done here, that "the 'common use' test is the historical analysis called for in this case" so "it is unnecessary to even consider the State's proffered historical analogues." SA925. And as to common use, Plaintiffs demonstrated that the banned firearms and magazines are in common use and owned by tens of millions of Americans. *See, e.g.*, SA917–18.

At any rate, any additional facts on which Plaintiffs have relied before this Court—such as facts relating to the commonality, the nature of the banned arms and the contents of historical statutes that impacted the right to keep and bear arms—are "legislative facts." "Legislative facts" are general facts about the world that transcend the immediate activities of the parties but "have relevance to legal reasoning . . . in the formulation of a legal principle or ruling by a judge or court." FED. R. EVID. 201, 1972 Advisory Committee Note; *see also Ind. Harbor Belt R.R.*

*Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). In a facial constitutional challenge like this one, *all* the relevant facts are "legislative facts" because, "[o]nce standing is established, the plaintiff's personal situation becomes irrelevant." *Ezell v. City of Chicago*, 651 F.3d 684, 697 (7th Cir. 2011). This Court's review of legislative facts is both *de novo* and unrestricted by what was presented to the district court, and "any limitation in the form of indisputability, any formal requirement of notice other than those already inherent in affording an opportunity to hear and be heard and exchanging briefs, and any requirement of formal findings at any level" is "inappropriate." FED. R. EVID. 201, 1972 Advisory Committee Note; *see also United States v. Singleterry*, 29 F.3d 733, 740 (1st Cir. 1994); *cf. Teter*, 76 F.4th at 946–47. After all, "the court may ascertain as it sees fit any fact that is merely a ground for laying down a rule of law." *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 548–49 (1924) (Holmes, J.). "To forbid such recognition would force courts to fashion laws without reference to reality." *In re Asbestos Litig.*, 829 F.2d 1233, 1245 (3d Cir. 1987) (Becker, J., concurring). The State's argument amounts to precisely that—a plea to this Court to fashion a Second Amendment rule of law without reference to reality.

The State argues that the historical questions raised by this case cannot be "legislative facts" because *Bruen* referenced "historical evidence" and a "historical record compiled by the parties." State Br. at 21 (quoting *Bruen*, 142 S. Ct. at 2130

n.6). But *Bruen* confirms that appellate courts are not bound by a district court factual record when considering history. There was no evidence "in the record" in *Bruen*, which was dismissed on the pleadings by the district court. *New York State Rifle & Pistol Ass'n, Inc. v. Beach*, 354 F. Supp. 3d 143, 148–49 (N.D.N.Y. 2018). The same was true in *Heller*, and in both cases the Supreme Court conducted a fulsome historical analysis and rejected requests that the cases be remanded for further factual development, *Bruen*, 142 S. Ct. at 2135 n.8; *see also* Br. for the United States of America at 31 n.9, *District of Columbia v. Heller* (Jan. 11, 2008) (No. 07-290). And in both cases, the Court considered information presented by the parties and their amici without any consideration of whether it was presented below. *See, e.g.*, *Bruen*, 142 S. Ct. at 2132 ("[W]e find no such tradition in the historical materials that respondents and their *amici* have brought to bear on that question.").

### C. This Case Presents Neither Unprecedented Societal Concerns Nor Dramatic Technological Changes.

The State next argues that the district court was correct to find that the Delaware Bans "implicate 'unprecedented societal concerns' and 'dramatic technological changes.' " State Br. 31 (quoting A26). Even if the State were right, it would be irrelevant. "[U]nprecedented societal concerns" or "dramatic technological changes" may require a "more nuanced approach" from a court analogizing to historical regulations, but they do not offer the State a free pass. *Bruen*, 142 S. Ct. at 2132. A "more nuanced approach" makes no difference when the analogy has

*already been drawn* by the Supreme Court. And in any event, the specific rule the Supreme Court has derived for cases like this one—that arms "in common use" today are protected—inherently accounts for technological and social changes on which the State places so much emphasis.

Nevertheless, the State spends much of its brief emphasizing alleged societal changes and technological advances represented by the banned firearms and magazines. *See* State Br. 31–42. These arguments appear to be primarily aimed at emphasizing how important (in its view) the challenged laws are. But under *Bruen* interest-balancing arguments are out of bounds and this Court must guard against giving credence to such arguments, however presented. *See Bruen*, 142 S. Ct. at 2133 n.7.

In any event, this case involves neither technological changes nor unprecedented social concerns. Several of the changes and concerns the State highlights—mass shootings, increased lethality, armor penetration, and heightened wounding potential, State Br. 31–34, 36, 41, were addressed in Plaintiffs' opening brief and the State does not respond meaningfully to Plaintiffs' arguments, *see Gray* Br. 37–42. The State does dispute that "firearm violence" has long been a significant problem in America because "[t]hat level of generalization is inappropriate," and, it says, the focus should be exclusively on "mass shootings and increas[ed] casualties in shootings involving assault weapons and LCMs." State Br. 31. The State should

not be heard to complain about levels of generality, given that its historical analysis broadly concludes that legislatures may "ban[] certain weapons to protect public safety." *Id*. at 52. And in any event, violence, even mass violence, is not a new concern, *see* RANDOLPH ROTH, AMERICAN HOMICIDE 348 (2009) (discussing notable incidents of mass murder in the Reconstruction South) yet the State has not identified a tradition of banning law-abiding citizens from possessing commonly possessed arms in response to *any* sort of violence. In any event, no link between the specific firearm violence problems the State identifies and the banned firearms and magazines can be demonstrated. *See Gray* Br. 51–52.

The State's other arguments that these firearms present unprecedented dangers are similarly baseless. The State argues that bullets fired from the banned firearms are somehow more destructive than identical bullets fired from other guns, claiming that AR-15 bullets in Vietnam were shown to be capable of decapitating enemies or causing "the abdominal cavity to explode." State Br. 37 (quotations omitted). The State's support for this proposition is ultimately a U.S. military report from 1962 which featured outlandish claims about the power of these rifles. Though the U.S. Army's Wound Ballistic Laboratory attempted to replicate the claimed effects, they were never able to do so, *see* David Kopel, *How powerful are AR rifles?,* REASON MAG. (Feb. 27, 2023) available at https://bit.ly/3t4Vh7g, and in fact further military experience with the rifles undermined those reports. *See, e.g.*, Martin L. Fackler,

*Gunshot Wound Review*, 28 ANNALS OF EMERGENCY MED. 194, 197, 202 (Aug. 1996) ("The damage caused by the military rifle bullet cannot be differentiated from that caused by a handgun bullet even by the most expert."). The State claims that it is immaterial that AR-15s are capable of only semiautomatic fire since "numerous inexpensive products . . . allow semi-automatic assault weapons to fire at rates approaching fully automatic weapons." State Br. 39 n.24. If that is the State's concern, it seems reasonable to ask why those products are nowhere mentioned in its definition of "assault weapons" and instead it is focused on whether, for example, a rifle has a pistol grip.

### D. The State Has Failed to Justify Its Bans.

Turning at last to the State's attempt to find historical support for the Bans, it has still presented *no* valid analog that would support the proposition that a state can ban law-abiding citizens from possessing arms that are in common use. *See* State Br. 52. The State makes two errors that pervade its analysis. First, it emphasizes too many laws that post-date by too far the Founding, the key period for understanding the scope of the Second Amendment. *See Gray* Br. 32–33. The Supreme Court has repeatedly (including in *Bruen*) stated that the Bill of Rights means the same thing whether applied against the States or the federal government, and it has interpreted its meaning with primary reference to the Founding. *See Worth v. Harrington*, No. 21-cv-1348, 2023 WL 2745673, at *10–12 (D. Minn. Mar. 31, 2023). Second, the

State, just like the district court, cites almost no historical laws directly, preferring to focus on history as filtered (and misconstrued) by its experts, but the laws tell a much different story than the experts. *See, e.g.*, *Gray* Br. 43–44. The State leaves most of Plaintiffs' arguments regarding its misreading of history unrebutted.

Beginning in the Founding era, the State cites laws restricting billy clubs, bludgeons, and slungshots, *see* State Br. 48, but it fails to mention that Plaintiffs have already demonstrated that these laws were not as restrictive as the State claims, *Gray* Br. 45. The State also reiterates the patently false claim that "fifteen states categorically barred the[] carry[ing]" of Bowie knives. State Br. 49. At most, *three* states (two of which also had outlier restrictions on handguns that the *Bruen* Court rejected as analogues in that case) had such restrictive laws. *Gray* Br. 44–45. Falling back from that untenable position, the State complains that "it is Plaintiffs who omit that the Bowie knife laws surveyed included laws that criminalized any carry and imposed enhanced criminal penalties for using the knives, regulatory taxes, and anti-brandishing laws." State Br. 50. But Plaintiffs *did* acknowledge the three laws that criminalized carry. As for laws that imposed enhanced criminal penalties for illegal use, taxed ownership, or prohibited brandishing—they are unlike the Delaware Bans which criminalize *possession* of the firearms in question. A ruling for Plaintiffs would not call into question statutes punishing the criminal *misuse* of firearms to commit violent crimes.

The State charges Plaintiffs with "misread[ing] other historical regulations [from this period] as well." *See* State Br. 50 n.30. It claims plaintiffs read a "nonexistent 'intent' qualifier into Colo. Rev. Stat. 1774 § 248 (1881)" (a Bowie knife law). *Id.* But Plaintiffs did no such thing. Plaintiffs noted that three of the State's Bowie knife laws "merely banned concealed carry or open carry with intent to use the knife in crime" and cited to the Colorado statute, which *did* only ban *concealed* carry. *Gray* Br. 43. The State also charges Plaintiffs with "ignoring [the] last sentence of George R. Donnan, Ann. of Crim P. & Penal Code of the State of N.Y. as Amended 1882–5, § 410 (1885)." State Br. 50 n.30. Plaintiffs also cited that statute as one that targeted only concealed carry or open carry with intent. *Gray* Br. 43. The last sentence of the statute reads: "The possession, by any person other than a public officer, of any of the weapons specified in the last section, *concealed or furtively carried on the person*, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section." That is entirely consistent with Plaintiffs' description. The State faults Plaintiffs for citing *Nunn v. Georgia*, 1 Ga. 243 (1846), because that case involved an individual carrying a pistol, but the *Nunn* statute that was held unconstitutional to the extent it barred carrying weapons openly *also* applied to Bowie knives, *id.* at 246, so it is relevant here. And Plaintiffs did not "fail[] to address relevant Bowie knife cases cited by Spitzer." State Br. 50 n.30. Spitzer cited four such cases, one of which was *Nunn*.

A311–14. The other three dealt only with bans on concealed carriage, *see Aymette v. State*, 21 Tenn. 154 (1840), *Haynes v. Tennessee*, 24 Tenn. 120 (1844), or a law that provided for enhanced penalties for a killing committed with a Bowie knife, *see Cockrum v. State*, 24 Tex. 394 (1859). Such laws are unlike the Delaware Bans which prohibit simple ownership of the targeted firearms and magazines.

Turning to laws post-dating the Civil War, the State claims that six states "barred possession of multi-shot handguns outright." State Br. 52. This claim best exemplifies the State's unwillingness to engage with the demonstrated shortcomings of its expert's analysis. It makes no reference to Plaintiffs' brief which demonstrated that, in fact, *none of the laws* cited for this proposition support it. *See Gray* Br. 46. Even ignoring the inaccuracy, the State's claim that these laws (and other laws targeting concealed or concealable sword canes and daggers) "burdened, to an extent, individuals' rights to armed self-defense. But individuals could utilize other arms that did not present the same risk," State Br. 52, represents a view of the Second Amendment right that was squarely rejected in *Heller*. *See* 554 U.S. at 629.

As to the 20th century laws on which the State relies, *see* State Br. 53–55, they come too late to aid this Court's analysis. *See Bruen*, 142 S. Ct. at 2154 n.28. As Plaintiffs have explained, laws regulating machine guns are different in kind than laws regulating semiautomatics in common use, and as with so many of its other laws, the State greatly overstates the scope and significance of the laws it claims

limited ammunition capacity for semiautomatics. *Gray* Br. 48–49. The State, again, makes no response to Plaintiffs' refutation of its arguments. The State also looks for support to laws banning short-barreled shotguns. State Br. 55. But even as it cites them, it explains why they are irrelevant: the Supreme Court has noted that such firearms are not protected under the Second Amendment. *United States v. Miller*, 307 U.S. 174, 178 (1939); *see also Heller*, 554 U.S. at 622.

There is no basis, on this historical record, to conclude that Delaware's sweeping ban of common semiautomatic firearms and magazines is constitutional. The State collects a series of district court cases from which it purports to draw additional support, *see* State Br. 55–58, but these cases are duplicative of the State's reasoning and should be rejected for having made many of the same errors that the State makes here.

## III. The Remaining Injunction Factors Favor Plaintiffs.

Plaintiffs' Second Amendment rights are being violated, so the remainder of the injunction factors follow naturally. *Gray* Br. 52. *See also Baird v. Bonta*, --- F.4th ----, 2023 WL 5763345, at *9 (9th Cir. Sept. 7, 2023). The State's arguments regarding irreparable harm and the public interest almost entirely fail if that premise is granted. *See, e.g.*, State Br. 62. The State argues that Plaintiffs' "four-month delay in seeking a preliminary injunction undermines their claims of irreparable harm," *id.* at 63, but for support of that proposition it cites to instances in which injunctions

were sought after delays of 3 years and 17 months, respectively, in cases not about the loss of a fundamental constitutional right but about intellectual property. "[D]elay is but one factor in the irreparable harm analysis," *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009); *see also York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 309 (6th Cir. 2019) (six-month delay not unreasonable). It weighs much less strongly in cases like this one where the harm befalling the Plaintiffs—loss of a constitutional right—is irreparable even if the loss is for a brief period. *Tripathy v. Lockwood*, No. 22-949-pr, 2022 WL 17751273, at *2 (2d Cir. Dec. 19, 2022).

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's denial of a preliminary injunction.

Dated: September 20, 2023      Respectfully submitted,

Bradley P. Lehman            /s/ David H. Thompson
GELLERT SCALI BUSENKELL      David H. Thompson
    & BROWN LLC             Peter A. Patterson
1201 N. Orange Street, Ste. 300    John D. Ohlendorf
Wilmington, DE 19801        William V. Bergstrom
Tel: (302) 425-5800          COOPER & KIRK, PLLC
Fax: (302) 425-5814         1523 New Hampshire Avenue, N.W.
blehman@gsbblaw.com       Washington, D.C. 20036
                            Tel: (202) 220-9600
                            Fax: (202) 220-9601
                            dthompson@cooperkirk.com

*Counsel for the* Gray *and* Graham *Plaintiffs-Appellants*

**CERTIFICATE OF BAR MEMBERSHIP**

I hereby certify that I am a member of the bar of this Court.

Dated: September 20, 2023

s/ David H. Thompson
David H. Thompson

*Counsel for* Gray *and* Graham
*Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of FED. R. APP. P. 32(a)(7)(B) because this brief contains 6,425 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Microsoft Office 365 in 14-point Times New Roman font.

As required by L.A.R. 31.1(c), the text of the electronic brief is identical to the text in the paper copies supplied to the Court.

The Portable Document Format version of the attached document has been scanned for viruses using VirusTotal Antivirus Software, and according to that program, the document is free of viruses.

Dated: September 20, 2023

s/ David H. Thompson
David H. Thompson

*Counsel for* Gray *and* Graham
*Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system on September 20, 2023. Service on all counsel for all parties has been accomplished via ECF.


Dated: September 20, 2023                         s/ David H. Thompson
                                                David H. Thompson

                                                *Counsel for* Gray *and* Graham
                                                *Plaintiffs-Appellants*